EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Alexis Delgado Hernández<br><br>Peticionario<br><br>Ex Parte | Certiorari<br><br>2005 TSPR 95<br><br>164 DPR \_\_\_\_ |

Número del Caso: CC-2004-708

Fecha: 30 de junio de 2005

Tribunal de Apelaciones:

                Región Judicial de Humacao

Juez Ponente:
                Hon. Ismael Colón Birriel

Abogado de la Parte Peticionaria:

                Lcdo. José Luis Velázquez Ruiz

Oficina del Procurador General:

                Lcda. Sariely Rosado Fernández
                Procuradora General Auxiliar


Materia: Corrección de Acta

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Alexis Delgado Hernández

    Peticionario                        CC-2004-708

    Ex Parte

Opinión del Tribunal emitida por la Juez Asociada señora Rodríguez Rodríguez.

San Juan, Puerto Rico, a 30 de junio de 2005

    Tenemos ante nuestra consideración, nuevamente, la situación de una persona que habiendo nacido varón, se somete a una cirugía de reasignación de sexo y nos solicita que su certificado de nacimiento y su licencia de conducir se corrijan para que reflejen correctamente su identidad sexual.

**I**

    Alexis Delgado Hernández ("Delgado Hernández") nació varón el 27 de octubre de 1970 en Fajardo, Puerto Rico. Dicho nacimiento se inscribió en el Registro Demográfico, según surge del Certificado de Nacimiento número 152-1970-02267-000000-176071. El 23 de mayo de 2003 el recurrido fue sometido a una

operación quirúrgica de reasignación de sexo (varón a mujer) en el Mount San Rafael Hospital en Colorado.[1]

El 22 de diciembre de 2003, Delgado Hernández presentó una petición ante el Tribunal de Primera Instancia, Sala Superior de Humacao, para que se enmendaran su certificado de nacimiento específicamente, el asiento de inscripción que identifica su sexo como varón y su licencia de conducir para conformarlos a su nueva realidad. Solicitó además que dichos documentos oficiales reflejaran también que su nombre era Alexandra Delgado Hernández.

El 20 de enero de 2004, el foro de instancia emitió una resolución donde ordenó al aquí peticionario someter un certificado negativo de antecedentes penales en un término de quince (15) días. Además, le concedió al Ministerio Público un término de quince (15) días para expresarse en torno a la petición, y le advirtió que, de no hacerlo, se entendería que se allanaba a la misma. El 10 de febrero de 2004, el peticionario presentó moción, acompañando el certificado requerido. El Ministerio Público no compareció.

Así las cosas, el 24 de febrero de 2004, el foro de instancia emitió una escueta resolución, donde ordenó al Registro Demográfico alterar el asiento de inscripción de nacimiento de Delgado Hernández para que apareciera que su

---

[1] Existe en el expediente copia de la certificación médica a esos efectos titulada *Affidavit by Physician as to Change of Sex Designation*. Véase apéndice del recurso de certiorari, pág. 5.

sexo era femenino y que su nombre es Alexandra Delgado Hernández. Ordenó, a su vez, que el Departamento de Transportación y Obras Públicas realizara los cambios correspondientes en la licencia de conducir.

Inconforme, el Procurador General acudió ante el foro apelativo intermedio aduciendo que la determinación del tribunal de instancia era improcedente en derecho por lo que debía ser revocada. Como asunto de umbral le planteó al tribunal apelativo que la falta de diligencia del Ministerio Público al no comparecer ante el tribunal *a quo* a oponerse a la solicitud, no podía coartar el derecho del Estado a revisar la determinación del tribunal de instancia por ser éste un asunto revestido de alto interés público. El Tribunal de Apelaciones acogió la comparecencia del Estado.

En su escrito, el Procurador General argumentó que la determinación del tribunal de instancia era errónea toda vez que el certificado de nacimiento tiene como propósito recoger un dato histórico cierto al momento del nacimiento, como lo es el sexo de una persona. Adujo que un transexual que se somete a una operación de reasignación de sexo de hombre a mujer sigue siendo hombre biológicamente, ya que sus cromosomas siguen siendo de varón; por lo que no ha ocurrido, verdaderamente, un cambio de sexo. Argumentó, que darle curso a la solicitud de Delgado Hernández tendría como posible consecuencia que una persona que fuera transexual contrajera matrimonio con una persona de su

mismo sexo biológico, en clara contravención a las leyes del Estado Libre Asociado de Puerto Rico. [2]

Delgado Hernández presentó su alegato en oposición al recurso presentado por el Estado. No queda claro de dicho escrito, sin embargo, cuáles son los fundamentos legales esbozados para sostener la validez de la determinación del foro de instancia.

Así las cosas, el Tribunal de Apelaciones dictó sentencia revocando al Tribunal de Primera Instancia.[3] En su sentencia, el foro apelativo intermedio concluyó que la Ley del Registro Demográfico, 24 L.P.R.A. § 1231, ("Ley del Registro Demográfico" o "Ley del Registro"), no contiene disposición alguna que permita que un certificado de nacimiento se enmiende para variar el sexo de la persona inscrita, en ausencia de circunstancias que indiquen que la anotación original fue producto de un error. El tribunal concluyó que para autorizar el cambio de sexo en el certificado era necesario una autorización expresa en ese

---

[2] Adviértase que la Ley Núm. 94 de 19 de mayo de 1999 enmendó el Art. 68 del Código Civil, 31 L.P.R.A. sec. 221, donde se define el matrimonio, para negarle efectividad jurídica ("full faith and credit") en Puerto Rico, a un matrimonio de personas del mismo sexo o de transexuales, efectuado fuera de la jurisdicción de Puerto Rico.

[3] En su sentencia, el Tribunal de Apelaciones reconoce que en *Ex parte Andino Torres,* 151 D.P.R. 794 (2000), permitimos, mediante sentencia a esos efectos, que se cambiara el sexo de un transexual en su certificado de nacimiento de varón a hembra. El foro apelativo concluyó, correctamente, que como se trataba de **una sentencia** y no una Opinión del Tribunal, nuestra determinación en *Andino Torres* no era un precedente obligatorio. *E.g., Rivera Maldonado v. E.L.A.,* 119 D.P.R. 74, 79-80 (1987). Véase discusión *infra.*

sentido de la Asamblea Legislativa, lo que no había ocurrido. Concluyó entonces que procedía revocar la Resolución dictada por el Tribunal de Primera Instancia. Al así hacerlo, no tan solo dejó sin efecto la orden autorizando el cambio de sexo en el certificado de nacimiento y la licencia de conducir, sino también el cambio de nombre solicitado y autorizado. Ello, a pesar que ese asunto no estaba ante su consideración toda vez que no fue planteado por el Procurador General en su petición de certiorari.

Inconforme, Delgado Hernández compareció ante nosotros para que revisemos la sentencia del Tribunal de Apelaciones. Aduce que:

> Erró el Tribunal de Apelaciones al revocar la Resolución del Tribunal de Primera Instancia que ordenaba al Registro Demográfico cambiar el asiento de inscripción de nacimiento del peticionario para que apareciera que su sexo es femenino y que ordenaba igual remedio en cuanto a su licencia de conducir.

El pasado 12 de noviembre de 2004 expedimos el auto solicitado. Contando con la comparecencia de las partes pasamos a resolver.[4]

## II

Este caso nos plantea la interrogante si un transexual que se ha sometido a una operación quirúrgica de reasignación de sexo, puede exigir que ese cambio se

---

[4] El alegato presentado por el peticionario, sorprendente-mente, no discute con rigurosidad jurídica el señalamiento de error traído a nuestra atención. La discusión del error se da sin acopio alguno de las razones que la fundamentan en derecho, ni las autoridades que lo apoyan.

refleje en su certificado de nacimiento —y otra documentación oficial— para que su realidad registral esté acorde con lo que estima es su verdadero sexo.

El sexo y la identidad sexual de una persona constituyen uno de los caracteres primarios de la identidad personal. Para algunos, el sexo queda definido fundamentalmente por sus caracteres biológicos y fisiológicos y su morfología exterior. "Es el sexo con que se nace y con el cual el sujeto se inscribe en el correspondiente registro del estado civil." C. Fernández Sessarego, *Derecho a la identidad personal*, Ed. Astrea, Buenos Aires, 1992, pág. 288. El sexo es por lo tanto inmutable y estático. De otro lado, existe una visión del sexo como un concepto que se refiere a la personalidad misma de la persona, a su actitud sico-social, a su modo de comportarse, a sus hábitos y ademanes. *Loc. cit.* De ordinario, ambas vertientes son coincidentes en el sujeto. Es decir, el sexo biológico, cromosómico y registral está en sintonía con el sicológico-social. En ocasiones sin embargo y, excepcionalmente, "se presentan situaciones [. . .] en las que se observa una elocuente disociación entre tales vertientes." *Loc. cit.*

El caso más dramático lo constituye el de un transexual, para quien su apariencia externa sexual no coincide con el sexo vivido y sentido, con el cual se identifica plenamente; situación ésta que "conduce al transexual, con la ayuda de tratamientos hormonales y de

cirugía transexual . . . a adaptar sus caracteres físicos externos al sexo querido." Ll. Puig Ferriol, *Manual de Derecho Civil*, Marcial Pons, Madrid, vol. 1, 1997, pág. 133.[5]

El tema de la transexualidad y sus repercusiones, tanto legales, sociales, sicológicas o morales, es un tema acuciante de nuestros tiempos y una realidad de profundo contenido humano.[6] Quienes han decidido someterse a una operación de reasignación de sexo, son personas que han

---

[5] Existe vasta literatura sobre el tema de la transexualidad, para una discusión más abarcadora sobre el tema véase, J. Meyerowitz, *How sex changed? A History of Transsexuality in the United States*, Harvard University Press, 2002; J.E. Schidt, *Attorney´s Dictionary of Medicine and Word Finder*, vol. 6, 2002; R. Green, *The 'Sissy Boy Syndrome' and the Development of Homosexuality*, Yale U. Press, New Haven, 1987; L. Martínez Calcerrada, *Derecho Médico General y Especial*, Ed. Tecnos, Madrid, 1986; H.W. Jones, W.E. Scout, *Hermafroditismo, anomalías genitales y trastornos endocrinos afines*, Ed. Labor, Madrid, 1975. Véase además, Lawrence, Factors Associated with Satisfaction or Regret Following Male to Female Sex Reassignment Surgery, 32 *Arch. Sexual Behavior* 299 (2003); Lax, Is the United States Falling Behind? The Legal Recognition of Post-Operative Transsexual´s Acquired Sex in the United States and Abroad, 7 *Quinnipiac Health L. J.* 123 (2003); Weiss, The Gender Caste System: Identity, Privacy and Heternormativity, 10 *Law & Sexuality* 123 (2001); Greenburg, Defining Male and Female: Intersexuality and the Collision between Law and Biology, 41 *Ariz. L. Rev.* 265 (1999); Coombs, Transgenderism and Sexual Orientation: More than a Marriage of Convenience, 3 *Nat´l J. Sexual Orient. L.* 4 (1997); Pearlman, Transexualism as Metaphor: The Collision of Sex and Gender, 43 *Buff. L. Rev.* 835 (1995); Valdés, Queers, Sissies, Dykes, and Tomboys: Deconstructing the Conflation of "Sex", "Gender", and "Sexual Orientation" in Euro American Law and Society, 83 *Cal. L. Rev.* (1995); Comment, Transsexualism, Sex Reassignment Surgery and the Law, 56 *Cor. L. Rev.* 933 (1971).

[6] Véase, entre otros, J. M. Bailey, *The man who would be Queen*, Joseph Henry Press, Wash., 2003; J. Finney Byland, *She´s not There, A Life in Two Genders*, Broadway Books, New York, 2002. Véase también, www.annelawrence.com/twr.

tomado medidas extraordinarias en su ardiente deseo de vivir una vida ordinaria.

La controversia traída a nuestra atención nos obliga a plantearnos, de frente al ordenamiento jurídico prevaleciente, un sinnúmero de difíciles interrogantes. A modo de ejemplo: ¿Sobre quién recae la responsabilidad de hacer viable el reclamo del peticionario, sobre la Rama Judicial a través de un pronunciamiento jurisprudencial o; por el contrario, sobre las ramas políticas del gobierno mediante la correspondiente legislación? ¿No entraña, en su esencia misma, esta determinación un asunto de política pública sobre cómo el Estado debe responder a los reclamos de unas personas tradicionalmente incomprendidas y marginadas por la sociedad, legislando los requisitos y las garantías pertinentes que tal reconocimiento necesariamente conlleva? ¿Cuál es el proceso más efectivo de deliberación y reflexión democrática que permita conjurar todos los intereses que interrelacionan en una controversia de esta naturaleza?[7]

Las preguntas que hemos formulado previamente, encierran sólo algunas de las múltiples y arduas cuestiones problemáticas que el tema de la transexualidad encierra. Como se advierte, la temática involucrada en dichas interrogantes no puede considerarse como materia de fácil

---

[7] C. Sunstein, *One Case at a Time*, Harvard University Press, Mass., 1999.

solución por sus implicaciones tanto con la libertad de la persona como con los intereses sociales en juego.

Veamos entonces con detenimiento y sosiego.

### III

La controversia jurídica sobre la transexualidad es para este Tribunal un asunto de reciente actualidad; más no es así en otras jurisdicciones. Tanto en Europa[8] como en los Estados Unidos[9] este tema ha sido discutido ampliamente, por lo que existe vasta jurisprudencia y amplia legislación sobre el tema de la transexualidad.

En *Ex parte Andino Torres*, 151 D.P.R. 794 (2000) dictamos una **sentencia** en la cual se autorizó el cambio de sexo —de varón a hembra— en el certificado de nacimiento

---

[8] Sobre este particular, en Gran Bretaña véase: *Bellinger v. Bellinger* (2003) UKHL 21, *Goodwin v. United Kingdom* (2002) 35 E.H.R.R. 18; *Cossey v. United Kingdom* (1990) 13 E.H.R.R. 622; *Corbett v. Corbett* (1970) 2 All E.R. 33. En España, véase Sentencia de 2 de julio de 1987; Sentencia de 15 de julio de 1988; Sentencia de 3 de mayo de 1989 y Sentencia de 19 de abril de 1991. Véase, sobre estas sentencias, A. Villagómez, *Aportación al estudio de la transexualidad*, Ed. Tecnos, Madrid 1994.

En Australia confróntese, *In re Kevin*, 28 Fam. L.R. 158 (2001).

Cinco países europeos tienen legislación sobre transexualidad: Ley de 21 de abril de 1972 (Suecia), Ley de 10 de septiembre de1980 *Transsexvellengesetz* (Alemania), Ley de 14 de abril de 1982 (Italia); Ley de 24 de abril de 1985 (Holanda)y Ley Núm. 3444 de 1988 (Turquía). Véase: Ll. Puig Ferriol, *Manual de Derecho Civil*, Marcial Pons, Madrid, vol. 1, 1977, págs. 133-134.

[9] En Estados Unidos véase: *In the Matter of Heiling*. 816 A.2d 68 (Md. 2003); *Littleton v. Prange*, 9 S.W.3d 223 (Tx. 1999); *In re Ladrach*, 513 N.Ed.2d 828 (Ohio 1987); *K. v. Health Division*, 560 P.2d. 1070 (Or. 1977); *M.T. v. J.T*, 355 A. 2d. 204 (N.J. 1976); *Matter of Anonymous*, 314 N.Y.S.2d. 668 (1970); *Matter of Anonymous*, 293 N.Y.S. 2d.(1968); *Anonymous v. Weiner*, 270 N.Y.S. 2d. 319 (1966).

del peticionario quien era transexual. Habiéndose resuelto *Andino Torres* mediante sentencia, lo allí dispuesto no constituye precedente de este Tribunal por lo que no obligaba al Tribunal de Apelaciones, como éste correctamente concluyó, y mucho menos nos obliga a nosotros.

Reiteradamente hemos sostenido que el Tribunal Supremo establece una norma **exclusivamente** mediante un dictamen sostenido por una opinión firmada o una opinión *per curiam*. *Rivera Maldonado v. E.L.A.*, 119 D.P.R. 74 (1987); *Mayol v. Torres*, res. 8 de abril de 2005, n. 17, 163 D.P.R. ___, 2005 T.S.P.R. 45; *Díaz v. Colegio Nuestra Sra. Del Pilar,* 123 D.P.R. 765, 777 (1989). Véase además, R. Elfren Bernier, J. Cuevas Segarra, *Aprobación e Interpretación de las Leyes en Puerto Rico*, Publicaciones JTS, 2da ed., 1987, pág. 158. De ahí que, de ordinario, sólo la opinión firmada o el *per curiam* se publican. Regla 44(b) del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. I-A. Así, nuestras opiniones sirven de precedentes para los casos que tienen ante sí los foros *a quo* tanto judiciales como administrativos.

Por otro lado, este Tribunal resuelve un caso por sentencia cuando en el mismo se plantean asuntos resueltos reiteradamente por el Tribunal; o, **para resolver una controversia particular entre las partes litigantes, circunscrita por lo tanto a los hechos específicos de ese caso**; o, para disponer rápidamente del caso ante el gran número de casos que tiene que resolver. Las sentencias por

lo tanto no se publican.[10] Es por ello que hemos indicado que no "[s]e considera apropiado citar como autoridad o precedente las sentencias que no constituyen opinión. . . ." *Rivera Maldonado, supra*, pág. 79.

En vista de lo anterior, lo dispuesto en *Ex parte Andino Torres*, solo resolvió la controversia particular de ese caso en atención a los hechos específicos allí involucrados. Por ello, *Ex parte Andino Torres* no es óbice para la determinación que hoy tomamos. Veamos entonces.

En esta ocasión, estimamos apropiado iniciar nuestra discusión analizando la figura del Registro Civil español, precursor del Registro Demográfico, de suerte que logremos apurar su finalidad y propósito. Luego entonces analizaremos la Ley del Registro Demográfico, su relación con la figura del Registro Civil, para aplicar así la normativa vigente a los hechos del caso ante nuestra consideración.

El Registro Civil se define como "la institución o servicio administrativo a cuyo cargo se halla la publicidad de los hechos afectantes al estado civil de las personas o mediatamente relacionados con dicho estado, contribuyendo,

---

[10] Ahora bien, "[a] manera de excepción y mediante orden expresa nuestra, se puede remitir para publicación una sentencia emitida sin opinión." *Rivera Maldonado v. E.L.A.,* 119 D.P.R. 74, 79 (1987). Así pues, con sujeción a lo dispuesto en el Reglamento del Tribunal Supremo, nada impide que "cualquier Juez de este Tribunal que emita una opinión concurrente o disidente o voto particular en relación con una decisión sin opinión del Tribunal, la certifique para que sea enviada al compilador y Publicista de Jurisprudencia del Tribunal y el Colegio de Abogados de Puerto Rico para su publicación." *Ibíd*, págs. 79-80.

en ciertos casos a la constitución de tales actos y proporcionando títulos de legitimación de estado." Puig Ferriol, *op. cit.*, pág. 136. El profesor Luces Gil, en su obra sobre el Registro Civil sostiene igual posición, y señala que el Registro es "la institución que tiene por objeto dar publicidad a los hechos y actos que afectan al estado civil de las personas, cooperar, en ciertos casos, a la constitución de tales actos *y,* proporcionar títulos de legitimación del estado civil." F. Luces Gil, *Derecho Registral Civil*, Ed. Bosh, Barcelona, 1976, pág. 170. Véase en igual sentido, J. Santos Briz, *Derecho Civil, Teoría y Práctica,* Ed. Revista Derecho Privado, Madrid, 1976, vol. 1, pág. 463.

Estado civil es el conjunto de cualidades, atributos y circunstancias de la persona que la identifican y singularizan y, que contribuyen a determinar su capacidad con cierto grado de permanencia y generalidad. Luces Gil, *op. cit*; Puig Ferriol, *op. cit*, pág. 130 ("[El estado civil] determina las distintas situaciones en la que puede encontrarse la persona y que justifican el reconocimiento de una diferente capacidad de obrar o de una situación diferenciada de derechos y deberes, susceptibles de un tratamiento unitario.")

Sobre el Registro como prueba fidedigna del estado civil de las personas, nos dice Albaladejo:

"[E]llo beneficia, tanto al interesado, como al Estado y a los terceros, que así pueden

obtener la información que necesitan cuando entran en relación con aquéllas."

M. Albaladejo, *Derecho Civil*, Ed. Bosh, Barcelona, Tomo I, vol. 1, 1989, pág. 358.

En el Registro se inscriben, por lo tanto, todos los sucesos y hechos vitales que definen el estado civil y la capacidad jurídica de un individuo. J. L. Lacruz Berdejo, *Elementos de Derecho Civil,* Ed. Bosh*,* Barcelona, Tomo I (1974), pág. 170. Entre los cuales destacamos el nacimiento y junto a éste, el nombre, **el sexo**, y la filiación del inscrito. Art. 41, Ley del Registro Civil español; Art. 167, Reglamento del Registro Civil. Tienen cabida en el registro también: el matrimonio, la nacionalidad y la defunción. Todos estos atributos de la personalidad se caracterizan, entre otras cosas, por "[t]ener eficacia general, es decir frente a todos (*erga omnes*)." Albaladejo, *op. cit.*, pág. 236. Comienza así con el nacimiento, el registro de datos vitales de cada persona, que lo individualiza y lo convierte en sujeto de derechos y finaliza, evidentemente, con el fallecimiento.

La existencia del Registro se justifica en la medida que el Derecho y las relaciones que regula requieran seguridad, certidumbre y constancia sobre las condiciones de capacidad y el entorno familiar de la persona. El Registro se convierte entonces en un sistema de

constatación de hechos relevantes de ese titular.[11] Así, lo que le da relieve es esencialmente su finalidad, ser **"el instrumento material para que conste públicamente la versión oficial sobre la existencia, estado civil y condición de las personas."** Vázquez Bote, *Derecho Privado Puertorriqueño*, Equity Publishing, 1992, Vol. III, pág. 400.[12] (Énfasis nuestro.) Por ser esa su función, "la veracidad e integridad del Registro del estado civil ha de tener singular importancia para el Estado, por cuanto representa, además, **un medio de conocer la exacta y auténtica situación jurídica de las personas**, al tiempo que pueden ser instrumentos muy convenientes para ordenar

---

[11] Históricamente, el precedente directo del Registro Civil español se halla en los Registros parroquiales que lleva la Iglesia Católica para consignar los bautismos, matrimonios y defunciones desde mediados del Siglo XIV y principios del XV. M. Albaladejo, *Derecho Civil,* Bosh, Barcelona, Tomo I, vol. 1, 1991, pág. 358. La Revolución Francesa secularizó estos Registros, creando el moderno Registro Civil a cargo de funcionarios del Estado. J. Castán Tobeñas, *Derecho Civil Español, Común y Floral*, Ed. Reus, Madrid, Tomo I, vol. 2, 1984, pág. 508.

[12] Esta institución se incorpora a nuestro ordenamiento legal a finales del Siglo XIX cuando, en 1885, comenzó a regir en Cuba y Puerto Rico, la "Ley Provisional del Registro Civil" decretada por España en 1870, a raíz de la Constitución española de 1869. Con el cambio de soberanía en 1898, la estructura del sistema de Registro civil no sufrió cambio sustancial alguno. En el 1931, sin embargo, con la Ley Núm. 24 de 2 de abril de 1931, se produjo una reorientación del sistema tradicional del estado civil al crearse el Registro Demográfico. El nuevo esquema legislado centralizó las funciones del Registro en manos del Comisionado de Salud, eliminando el control que tenía sobre el Registro el municipio y el alcalde. *Municipio v. Fernós*, 63 D.P.R. 978 (1944). La Ley Núm. 24 tiene como propósito también recopilar información de naturaleza estadística.

determinados servicios administrativos. . . ." *Loc. cit.* (Énfasis nuestro.)

En síntesis, el Registro Civil tiene como propósito fundamental garantizar una información fiable sobre la condición civil y hechos vitales de las personas y proporcionar un medio de prueba de los mismos. Ello, para beneficio no tan solo del inscrito sino también del Estado y de los terceros que entran en relación con el primero. Es por lo tanto el Registro, un mecanismo que al garantizar seguridad, constancia y certeza en la información a que da publicidad, abona a la evitación de, entre otros, el fraude y la simulación en las relaciones que establecen los individuos entre sí y que el Derecho regula. Véase, Puig Ferriol, *op. cit.*, pág 136-37. En igual sentido, Luces Gil, op. cit., pág. 18; M. Planiol, G. Ripert, *Tratado Elemental de Derecho Civil*, Cárdenas ed., México, 4ta ed., Vol. 1, 2003, pág. 243 ("Las actas del estado civil constituyen un medio de prueba seguro y fácil, organizado por la ley para los nacimientos, matrimonios y defunciones.")

Pasemos entonces a discutir las disposiciones del Registro Demográfico.

**IV**

La Ley del Registro Demográfico de Puerto Rico, 24 L.P.R.A. secs. 1041 *et seq.*, crea un Registro General Demográfico, establecido en la División de Registro Demográfico o Estadísticas Vitales del Departamento de

Salud de Puerto Rico. El mismo se estableció con el propósito de registrar, coleccionar, custodiar, preservar, enmendar y certificar hechos vitales, de las personas nacidas en Puerto Rico. 24 L.P.R.A. sec. 1042 (1). Acorde al cambio habido en la legislación registral de 1931, el Registro Demográfico se convirtió principalmente en un registro estadístico confiable y formal que permite el estudio de estadísticas vitales de nuestra población. [13] Ciertamente, el propio cambio de nombre, de Registro Civil a Registro **Demográfico**, denota la intención de convertir el mismo en un instrumento para el estudio estadístico de la población de Puerto Rico conforme su composición y estado en un momento determinado, o conforme evolucione históricamente. Véase en general, E.A. Wrigley, *Historia y población, Introducción a la demografía histórica*, Ed. Guadarrama, Madrid, 1969.

No por ello sin embargo, dejó de tener la finalidad esencial de ser el instrumento en el cual constan públicamente la versión oficial sobre la existencia, estado civil y hechos vitales de las personas nacidas en Puerto Rico; y, como tal, servir de instrumento de constatación para quienes entran en contacto con las personas registradas. Así, en reiteradas ocasiones hemos señalado que la información que consta en el Registro Demográfico constituye evidencia *prima facie* del hecho que se pretende

---

[13] Véase, Exposición de Motivos, Ley. Núm. 220 de 9 de agosto de 1998.

constatar. *Medina v. Pons*, 81 D.P.R. 1, 8 n. 11 (1959);
*Bigas Surs. v. Comisión Industrial*, 71 D.P.R. 336 (1950);
*Pueblo v. Ramírez*, 65 D.P.R. 680 (1946); *Mercado v. American Railroad Co.*, 61 D.P.R. 228 (1943).

El certificado de nacimiento es el documento que refleja los datos vitales de la persona al momento de su nacimiento. **Es por lo tanto una radiografía histórica de la persona al nacer, que deja constancia de la siguiente información: fecha y lugar de nacimiento, nombre de los padres, nombre y sexo de la persona inscrita.** Véase, *K. v. Health Div. Dept. of Human Services*, P.2d 1072, 1072 (Or. 1977) ("it was the intent of the legislature of Oregon that a 'birth certificate' is an historical record of the facts as they existed at the time of birth.")

Las constancias del registro están sujetas a enmiendas únicamente, de manera excepcional. Lacruz Berdejo nos señala sobre este particular lo siguiente: "excepcionalmente pueden corregirse los defectos [. . .] restituyéndolos a la redacción que debieran tener, en diversos supuestos en los que no puede haber sospecha de posible fraude. . ." Lacruz Berdejo, *op. cit.*, pág. 177.

La Ley del Registro Demográfico provee el procedimiento para enmendar el certificado de nacimiento, también a manera de excepción. Así, la Ley dispone:

> [L]as omisiones o incorrecciones que aparezcan en cualquier certificado antes de ser registrados en el Departamento de Salud podrán ser salvadas insertando las correcciones o adiciones necesarias en tinta roja en dicho certificado,

**pero luego de haber sido archivado en el Departamento de Salud, no podrá hacerse en los mismos rectificación, adición ni enmienda alguna que altere sustancialmente el mismo, sino en virtud de orden del Tribunal de Distrito, cuya orden, en tal caso, será archivada en el Departamento de Salud haciendo referencia al certificado a que corresponda.**

Para obtener dicha orden deberá presentar el interesado una solicitud a la Sala del Tribunal de Distrito de su domicilio, exponiendo bajo juramento su pretensión y formulándola debidamente acompañada de la prueba documental pertinente en apoyo de su solicitud. Copia de la solicitud y de toda la prueba documental le será remitida al Ministerio Fiscal simultáneamente con su radicación quien deberá formular su posición dentro del término de 10 días.

. . .

El cambio, adición o modificación de nombre o apellido sólo podrá hacerse a instancia del interesado, quien deberá presentar ante cualquier Sala del Tribunal de Distrito oportuna solicitud, expresando bajo juramento los motivos de su pretensión, acompañada de la prueba documental pertinente en apoyo de su solicitud.

24 L.P.R.A. sec. 1231. (Énfasis nuestro.)

Esta disposición se complementa con la sección 1071-19 del Reglamento del Registro Demográfico, que a su vez dispone:

*Correcciones o alteraciones después de hecha la inscripción*– Después que un certificado haya sido aceptado por el registrador, no podrá ser objeto de ningún cambio, borradura o alteración, así como tampoco la trascripción hecha en el libro de récord, sin el debido procedimiento de ley. Los errores materiales que aparecieren en cualquier certificado al ser presentado para inscripción o luego de haber sido inscrito, consistentes en la equivocación de un nombre, apellido, palabra o frase no esenciales, podrán subsanarse escribiendo correctamente con tinta roja la palabra o palabras erróneamente escritas o insertando la palabra o palabras omitidas. Las tachaduras que fueren

necesarias se harán de modo que siempre se pueda leer la palabra tachada. Para efectuar dichas correcciones los registradores exigirán la prueba que, según los casos, estimen oportuna.[14]

Una lectura de estas disposiciones deja establecido que hay dos procesos de corrección o rectificación de errores: uno, antes de haberse registrado un certificado y el otro luego de archivado y registrado el mismo en el Departamento de Salud. En el primero de los casos, la ley permite que el propio Registrador pueda corregir "omisiones o incorrecciones" en la inscripción antes de que quede inscrito el certificado, insertando las correcciones correspondientes en tinta roja. Luego de registrado el certificado, la Ley del Registro prohíbe que se efectúe un cambio, rectificación o enmienda alguna que altere sustancialmente el certificado, salvo en virtud de orden judicial a esos efectos.

El Reglamento por su parte, aclara que el Registrador puede corregir equivocaciones en el nombre o los apellidos, palabras o frases **no esenciales** en el certificado luego de registrado sin orden judicial. No obstante, **cuando se trata de correcciones o enmiendas sustanciales** después de haber registrado el certificado en el Registro Demográfico, la ley sólo permite que se diluciden las mismas en un tribunal competente.

En muy pocas ocasiones nos hemos expresado sobre el procedimiento de enmienda o rectificación al certificado de

---

[14] Reglamento del Registro Demográfico Núm. 0316.

nacimiento o, el de inscripción de datos en el Registro Demográfico. *E.g.*, *Ex Parte Pérez*, 65 D.P.R. 938 (1946); *León Rosario v. Torres*, 109 D.P.R. 804 (1980). En ambas ocasiones interpretamos restrictivamente la Ley del Registro Demográfico y las disposiciones que permiten enmendar los asientos del Registro o registrar información en el mismo; concluyendo que los cambios solicitados tenían que haber sido autorizados previamente por ley antes de acceder a los mismos.

Así, en *Ex Parte Pérez*, *supra*, nos enfrentamos a una solicitud de cambio de nombre en el certificado de nacimiento. Resolvimos que, ante la ausencia de disposición alguna en la Ley del Registro Demográfico que específicamente autorizara el cambio solicitado, estábamos impedidos de acceder al mismo. Al así resolver, indicamos que le correspondía a la Legislatura hacer viable el cambio de nombre en un certificado de nacimiento. Señalamos específicamente que la Legislatura debía "corregir lo que entendemos es un defecto en nuestra legislación." *Ex Parte Pérez*, 65 D.P.R. págs. 942-43.

Posteriormente, la Asamblea Legislativa aprobó la Ley Núm. 119 de 12 de abril de 1950, para enmendar la Ley del Registro Demográfico y autorizar el cambio de nombre y apellido de una persona en su certificado de nacimiento. Esta ley se aprobó precisamente para atender el problema que creaba la ausencia de autorización legislativa para efectuar un cambio de nombre en el Registro Demográfico;

situación que advertimos en *Ex parte Pérez*.  Véase, Actas de la Cámara de Representantes, 17ma Asamblea Legislativa, Sesión Ordinaria, 1950, pág. 643.

De otra parte, en *León Rosario v. Torres*, *supra*, denegamos una petición de que se inscribiera en el Registro Demográfico el nacimiento de una niña nacida en Estados Unidos de padres puertorriqueños residentes todos en Puerto Rico, toda vez que la Ley del Registro Demográfico no lo contemplaba.  La Ley solo autoriza, de ordinario, la inscripción de niños nacidos en Puerto Rico.  Señalamos en esa ocasión que "las excepciones consignadas en la ley son de **restrictiva interpretación**", ya que el legislador siempre ha indicado expresamente lo que ha querido permitir que se inscriba en el Registro Demográfico.  *Íd.*, pág. 810. (Énfasis nuestro.) [15]  "No hay lugar en este esquema legislativo para una interpretación liberal en cuanto a los hechos vitales que son inscribibles." *Íd*.

Lo anteriormente reseñado denota claramente que hemos interpretado restrictivamente las disposiciones de la Ley

---

[15] En las instancias que el legislador ha querido permitir que se inscriban  el Registro Demográfico acontecimientos ocurridos fuera de Puerto Rico, lo ha autorizado expresamente en ley.  Así, ha dispuesto para: la inscripción de defunciones ocurridas en un barco o avión en travesía, o en el caso de ausentes, Ley Núm. 1 de 23 de febrero de 1978; la inscripción de nacimientos ocurridos en un barco o avión durante su travesía, *íd.*; la anotación de divorcios o anulaciones de matrimonios decretados fuera de Puerto Rico,  de personas cuyos matrimonios se hubieren celebrado en Puerto Rico, Ley Núm. 4 de 2 de marzo de 1971; y la inscripción de adopciones realizadas fuera de Puerto Rico de personas nacidas aquí, y realizadas aquí de personas nacidas fuera, Ley Núm. 84 de 15 de junio de 1953.

del Registro Demográfico.  Hemos dispuesto que cualquier cambio o rectificación en el certificado de nacimiento, una vez registrado o cualquier solicitud de inscripción de un hecho vital, tiene que haber sido autorizado previamente mediante legislación para que proceda el mismo.  Ello quiere decir que allí donde la Ley del Registro dispone que una **enmienda sustancial** a las constancias del certificado de nacimiento **sólo procede en virtud de una "orden del tribunal"**, la orden sólo procederá si el ordenamiento legal autoriza el cambio solicitado mediante legislación a esos efectos.

Habida cuenta de lo anterior, concluimos que **la Ley del Registro Demográfico establece, a modo de *numerus clausus*, las únicas instancias en que se pueden realizar cambios en las anotaciones de datos vitales en el certificado de nacimiento.**  Siendo ello así, no hay margen para una interpretación liberal o expansiva de las disposiciones de la Ley del Registro Demográfico.

Ello es cónsono con la normativa vigente sobre qué hechos son inscribibles en el Registro Civil.  En ese sentido nos indica Luces Gil:  "Pero, en la práctica, hay que reconocer **la imposibilidad de acceso al Registro de hechos o cualidades de estado civil no declarados expresamente inscribibles en la Legislación registral."** Luces Gil, *op. cit.*, pág. 30-31.  Recordemos que el Registro tiene como fin, entre otros, dar publicidad a los hechos que afectan el estado civil o datos vitales de las

personas **cuando éstas entran en relación con el Estado o con terceros**; y, que el certificado de nacimiento constituye además un documento que **recoge información histórica sobre hechos vitales de la persona al momento de su nacimiento.** Todo ello aconseja, como hemos hecho en el pasado y reafirmaos hoy, una interpretación restrictiva de la Ley del Registro Demográfico como garantía de certeza jurídica sobre la información allí contenida.

A la luz de lo anterior debemos forzosamente concluir que la Ley del Registro Demográfico no contempla y mucho menos autoriza, un cambio como el solicitado por el aquí peticionario. En ausencia de legislación que expresamente lo autorice estamos impedidos de reconocer como viable un cambio sustancial en las constancias del certificado de nacimiento de lo que es, un hecho vital de la persona, su sexo.

No cabe hablar en este caso de que existe laguna en la Ley del Registro Demográfico, 24 L.P.R.A. sec. 1041, *et seq.* Por el contrario, existe una prohibición expresa de hacer cambios sustanciales en las constancias originales del certificado de nacimiento. Según el *Diccionario de la Lengua Española*, es "sustancial" todo aquello que constituye lo esencial y más importante de algo. *Diccionario de la Lengua Española*, Tomo II, 2001, pág. 2115. Los cambios requeridos por el peticionario afectan el estado civil de la persona, eje central del Registro Demográfico; por lo que, estamos ante un cambio sustancial

cuya modificación solo compete a la Asamblea Legislativa.
La juez Patricia Wald, con gran claridad ha indicado:

> Personal experience has revealed that the nearly
> universal view among federal judges is that when
> we are called upon to interpret statutes, it is
> our primary responsibility, within constitutional
> limits, to subordinate our wishes to the will of
> Congress because the legislator's collective
> intention, however discerned, trumps the will of
> the court.

Wald, The Sizzling Sleeper: The Use of Legislative History
in Construing Statutes in the 1988-89 Term of the United
States Supreme Court, 39 *Am. U. L. Rev.* 277, 281 (1990).

Cuando el lenguaje de la ley es claro e inequívoco,
nuestra responsabilidad es respetar la voluntad
legislativa, independientemente de nuestro criterio
personal. *Alonso García v. Ramírez Acosta*, res. 16 de
septiembre de 2001, 155 D.P.R.___, 2001 T.S.P.R. 126;
*Lasalle v. Jta. Dir. A.C.C.A.*, 140 D.P.R. 694 (1994); *Silva
v. Adm. Sistema del Retiro*, 128 D.P.R. 256 (1991).
Corresponde a la Asamblea Legislativa y los legisladores
electos que allí sirven, determinar cuál deba ser la
política pública que encarnen nuestras leyes. *Pueblo v.
Zayas Rodríguez*, 147 D.P.R. 530 (1999). Las leyes son, en
última instancia, el reflejo de la voluntad del pueblo
expresada democráticamente a través de los legisladores
electos y, recogen aquello que el pueblo está dispuesto a
aceptar en un momento dado.[16] El juzgador no debe sustituir

---

[16] Valga señalar que en veinte y ocho (28) estados de los
Estados Unidos, se ha legislado para permitir que se
enmiende un certificado de nacimiento para que refleje los

su sentido de justicia por la letra clara del estatuto. *Berrocal v. Tribunal de Distrito*, 76 D.P.R. 38, 65 (1954).

Justipreciadas las preguntas que nos formulamos al inicio, somos del criterio que le corresponde a la Asamblea Legislativa sopesar todos los intereses involucrados en la controversia que trasluce el tema de la transexualidad, conjurar los mismos, y proponer la respuesta legislativa que se estime apropiada. En última instancia, bajo un

---

cambios habidos como resultado de una operación de reasignación de sexo.

En algunos de esos estados, el procedimiento establecido sólo requiere que se solicite del tribunal el cambio de sexo en el certificado de nacimiento, sin más; o, que se expida un nuevo certificado. *E.g.*, Ala. Code. sec. 22-9A-19(d), Ark. Code. Ann. sec. 20-18-307(d)(4), California Health and Safety Code sec. 103425, Colo. Rev. Stat. Ann. sec. 25-2-115(4), Conn. Gen. Stat. Ann. sec. 19a-42, D.C. Code Ann. sec. 7-217(d), Ga. Code Ann. sec. 31-10-23(e), Md. Code Ann. Health-Gen.I sec. 4-214 (b)(5), Miss. Code Ann. sec. 41-57-21, Mo. Stat. sec. 193.215, Mont. Code. Ann. sec. 50-15-204, Nv. Adm. Code sec. 440.130, Or. Rev. Stat. sec. 432-235, Utah Code Ann. sec. 26-2-11, Va. Code Ann. sec. 32.1-269, Wisc. Stat. sec. 69.15 (1)(a).

Otros estados, sin embargo, requieren una declaración jurada del médico o cirujano que llevó a cabo la operación, para que el tribunal pueda emitir su dictamen ordenando el cambio en el certificado de nacimiento. *E.g.*, Ariz. Rev. Stat. sec. 36-337 (a)(4), Haw. Rev. Stat. sec. 338-17.7 (4)(b), 410 Ill. Comp. Stat. Ann. sec. 535/7 (d), Iowa Code IV sec. 144.38, Ky. Rev. Stat. Ann. sec. 213.121 (5), La. Rev. Stat Ann. 40:62, Mass. Gen. Laws Ann. Ch. 46 sec. 13 (e), Mich. Comp. Laws sec. 333.2891 (9)(a), N.J. Stat. Ann. 26:8-40.12, Neb. Rev. Stat. sec. 71-904.01, N. M. Stat. Ann. sec. 24-14-25 (D), N.C. Gen. Stat. sec. 130A-118.

Tennessee es el único estado que tiene un estatuto que expresamente prohíbe el cambio de sexo en el certificado de nacimiento. T.N. Stat. Ann. sec. 191.028, 192.011. Véase también, *Changing Name & Sex On Birth Certificate United States, Canada & UK,* United States Department of State, http://www.kindredspiritlakeside.homestead.com/BirthRecord.html. Última revisión: 3 de noviembre de 2004.

sistema de separación de poderes como el establecido en nuestra Constitución, la facultad de aprobar las leyes la tiene la Asamblea Legislativa y le corresponde al Poder Judicial, entonces, la responsabilidad de resolver los litigios mediante la interpretación de la ley aprobada.

Habida cuenta de lo anterior, resolvemos que no procede autorizar el cambio solicitado en el certificado de nacimiento del peticionario para cambiar su sexo, toda vez que la Ley del Registro Demográfico no lo autoriza expresamente.

## V.

Antes de concluir debemos señalar, como indicamos al inicio, que el Tribunal de Apelaciones al revocar la Resolución del Tribunal de Primera Instancia, dejó sin efecto, suponemos por inadvertencia, la determinación de dicho foro autorizando el cambio de nombre del peticionario en su certificado de nacimiento. Al así hacerlo, sin embargo erró.

Hemos revisado el expediente y del mismo surge que el peticionario cumplió con todos los requisitos exigidos por la Ley del Registro para autorizar un cambio de nombre. Además, el Procurador General no cuestionó dicha determinación ante el foro apelativo intermedio. Por lo tanto no procedía revocar esa determinación del foro de instancia. En su consecuencia dejamos sin efecto esa determinación del Tribunal de Apelaciones. En cuanto a lo demás, se confirma el dictamen recurrido.

Por los fundamentos antes expuestos y expedido el auto de certiorari, se confirma la sentencia dictada por el Tribunal de Apelaciones en este caso en cuanto a la determinación de dejar sin efecto el cambio de sexo en el certificado de nacimiento autorizado por el Tribunal de Primera Instancia.

Se dictará sentencia de conformidad.


Anabelle Rodríguez
Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Alexis Delgado Hernández

                              CC-2004-708
         Peticionario

         Ex Parte


                            SENTENCIA

         San Juan, Puerto Rico, a 30 de junio de 2005

             Por los fundamentos expuestos en la Opinión
         que antecede los cuales se incorporan íntegramente
         a la presente, se dicta sentencia confirmando la
         sentencia dictada por el Tribunal de Apelaciones
         en cuanto a su determinación de revocar la
         determinación del Tribunal de Primera Instancia
         que autorizó el cambio de sexo en el certificado
         de nacimiento del Peticionario.  Se revoca la
         determinación del tribunal apelativo de dejar sin
         efecto el cambio de nombre del peticionario en su
         certificado de nacimiento por el tribunal de
         instancia.

             Así lo pronunció, manda el Tribunal y
         certifica la Secretaria del Tribunal Supremo.  El
         Juez Asociado señor Fuster Berlingeri y la Jueza
         Asociada señora Fiol Matta disienten con opinión
         escrita.  El Juez Asociado señor Rivera Pérez
         emitió opinión de conformidad.


                         Aida Ileana Oquendo Graulau
                         Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Alexis Delgado Hernández

    Peticionario

                            CC-2004-708

Ex – parte

OPINIÓN DE CONFORMIDAD EMITIDA POR EL JUEZ ASOCIADO SEÑOR RIVERA PÉREZ.

San Juan, Puerto Rico, 30 de junio de 2005.

    Estamos de acuerdo con el resultado de confirmar la sentencia recurrida dictada por el Tribunal de Apelaciones, y con sus fundamentos. Coincidimos con la Opinión mayoritaria sobre los impedimentos existentes, a tenor con la Ley del Registro Demográfico de Puerto Rico[17], que imposibilitan que se reconozca en los registros oficiales del Estado la llamada reasignación física del sexo de un transexual. No obstante, entendemos como necesario expresarnos sobre otros aspectos de igual o mayor importancia, dentro del "caso y controversia"

---

[17] 24 L.P.R.A. §1231.

ante nos. Entendemos que la controversia ante nuestra consideración, además del análisis circunscrito a la Ley del Registro Demográfico, *supra,* merece un análisis desde otra perspectiva. Es imprescindible evaluar y analizar las consecuencias que este asunto pueda acarrear en la estabilidad y formalidad de las instituciones del Estado. Tal es el caso, por ejemplo, del efecto acumulativo que tendría sobre importantes áreas e instituciones, partes del derecho de familia y del derecho sucesorio, entre otros.

I

En <u>Ex parte Andino Torres</u> [18] , este Tribunal tuvo la oportunidad de expresarse en un caso con una situación esencialmente idéntica a la que hoy nos ocupa. En aquella ocasión, el señor Andrés Andino Torres se sometió a una intervención quirúrgica y posteriormente compareció ante el Tribunal de Primera Instancia solicitando se enmendara el asiento que consigna su nacimiento en el Registro Demográfico de Puerto Rico para que se cambiara su nombre a Alexandra y se hiciera constar su sexo como femenino. Luego del correspondiente trámite procesal ante el Tribunal de Primera Instancia y el Tribunal de Apelaciones, este Tribunal, mediante Sentencia emitida el 30 de junio de 2000, accedió a concederle lo solicitado. El Juez Asociado señor Negrón García emitió Opinión Concurrente. Apoyó tal proceder en el principio de equidad, establecido en el Código Civil de

---

[18]  151 D.P.R. 794 (2000).

Puerto Rico que dispone lo siguiente: "[c]uando no hay ley aplicable al caso, el tribunal resolverá conforme a equidad, según la define el Artículo 7 del Código Civil".[19]

En Ex-Parte Andino Torres, *supra,* se emitió una Opinión Disidente por el entonces Juez Asociado señor Corrada del Río en la que hizo constar las razones que, además de las limitaciones impuestas por la Ley del Registro Demográfico, *supra*, imposibilitan el reconocimiento del cambio de sexo en los documentos oficiales del Estado. Hoy subscribimos aquella evaluación, análisis, y sus fundamentos, e incluimos otros motivos que ha expresado el Gobierno, que igualmente imposibilitan el reconocimiento de la llamada reasignación física de sexo en los documentos oficiales del Estado como una cuestión de interés apremiante. Veamos.

II

El 27 de octubre de 1970, el señor Alexis Delgado Hernández nació en Puerto Rico, exhibiendo fenotipo

---

[19] 31 L.P.R.A. sec. 7, Dicho artículo lee de la manera siguiente:

> El Tribunal que rehúse fallar a pretexto de silencio, obscuridad, o insuficiencia de la ley, o por cualquier otro motivo, incurrirá en responsabilidad.

> Cuando no haya ley aplicable al caso, el tribunal resolverá conforme a equidad, que quiere decir que se tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos.

masculino. El 23 de mayo de 2003, en el estado de Colorado, se sometió a una intervención quirúrgica. El 22 de diciembre de 2003, presentó una petición ante el Tribunal de Primera Instancia de Puerto Rico para que se enmendara el asiento que refleja su nacimiento en el Registro Demográfico de Puerto Rico y su licencia de conducir y así, se cambiara en ambos su nombre a Alexandra, y se hiciera constar su sexo como femenino. El Tribunal de Primera Instancia de Puerto Rico ordenó mediante Resolución al Registro Demográfico y al Departamento de Transportación y Obras Públicas, hacer los cambios solicitados, tanto el cambio de nombre como el cambio de sexo.

Posteriormente, compareció el Procurador General ante el Tribunal de Apelaciones solicitando se revocara la Resolución recurrida, dictada por el Tribunal de Primera Instancia. Ese Tribunal, previa comparecencia de ambas partes, procedió a revocar la referida orden emitida por el Tribunal de Primera Instancia. Utilizó como fundamento principal que la Ley del Registro Demográfico, *supra*, no contiene disposición alguna que permita que el asiento del nacimiento se enmiende para variar el sexo de la persona inscrita, en ausencia de circunstancias que indiquen que el asiento original fue producto de un error.

Acude ante nos el señor Alexis Delgado Hernández solicitando revoquemos la Sentencia emitida por el Tribunal de Apelaciones y mantengamos en vigor la orden emitida originalmente por el Tribunal de Primera Instancia.

III

No albergamos duda alguna sobre el derecho que le asiste a toda persona de expresar y vivir su sexualidad de la manera que entienda apropiada, dentro del ámbito protegido por el derecho constitucional a la intimidad. No obstante, esos deseos no pueden trascender y trastocar la formalidad y oficialidad de los documentos que emite el Gobierno, y mucho menos puede el Estado legitimar y oficializar algo que no estuvo sostenido con prueba pericial y científica como que haya ocurrido.

En Ex Parte Andino Torres [20], expuso el Juez Asociado señor Corrada del Río, citando al tratadista Díez del Corral Rivas: "...por mucho que una persona se sienta mujer esa circunstancia no puede bastar para fomentar y admitir oficialmente un estado o situación que sólo existe en la psicología del individuo".[21] Partiendo de esa premisa, nos planteamos la interrogante, como cuestión de realidad científica, ¿se produjo un cambio de sexo? [22] El factor psicológico determina el carácter y el comportamiento social e individual de un ser humano, pero no altera la realidad científica de su sexo.[23]

---

[20] 151 D.P.R. 794, 837 (2000).

[21] J. Díez del Corral Rivas, Estado civil y sexo. Transexualidad, 2 Actualidad Civil 2135, 2156 (1987).

[22] Ex Parte Andino Torres, supra, pág. 834.

[23] Íd., pág. 840.

El asunto medular en el caso de autos reside en el hecho que al peticionario haberse sometido a una cirugía y las partes genitales externas de su cuerpo aparentan haber sufrido algún cambio, no fue establecido con prueba pericial y científica por esa parte que efectivamente se haya producido una transformación en sus cromosomas. No obstante, para determinar el sexo de una persona que fue sometida a una intervención quirúrgica, no basta con auscultar la parte exterior de su cuerpo. Es menester evaluar, además, sus características cromosómicas, genéticas, hormonales y psicológicas.[24]

La clasificación sexual que corresponde a una persona queda definida al momento de su nacimiento tomando en consideración el fenotipo exhibido por la persona nacida. Ese fenotipo exhibido, salvo limitadas excepciones, normalmente coincide con una estructura cromosómica típica del sexo correspondiente. Es por esto que, mediante pruebas científicas, podemos determinar con exactitud, por medio de un examen cromosómico, cuál es el sexo de esa persona, toda vez que el sexo masculino se distingue por poseer cromosomas XY y el sexo femenino por poseer cromosomas XX.

Estamos conscientes de la existencia de una variedad de desórdenes que se manifiestan de distintas maneras. Tal es el caso de los hermafroditas, por mencionar alguno de ellos. En estos casos la persona no puede permanecer indefinidamente en un estado de incertidumbre sobre cuál es su sexo, ni en una

---

[24] Íd., pág. 835.

clasificación especial, por tal razón existe la necesidad de que esa persona escoja entre una de las dos opciones que, como una anomalía, su cuerpo presenta. Es decir, en estos casos la persona tiene que definir su sexo con posterioridad al nacimiento. Esa no es la situación ante nos. La posibilidad de que se reconozca un cambio de sexo en los documentos oficiales del Estado sin la prueba pericial y científica que lo justifique, crearía una situación anómala en diferentes áreas de nuestro ordenamiento jurídico. Permitiría, entre otros, soslayar la prohibición existente en nuestro Código Civil relativa a la celebración de matrimonios entre personas del mismo sexo. El Artículo 68 de nuestro Código Civil,[25] reza de la forma siguiente:

> El matrimonio es una institución civil que procede de un contrato civil en virtud del cual **un hombre y una mujer se obligan mutuamente a ser esposo y esposa, y a cumplir el uno para con el otro los deberes que la ley les impone.** Será válido solamente cuando se celebre y solemnice con arreglo a las prescripciones de aquélla, y sólo podrá disolverse antes de la muerte de cualquiera de los dos cónyuges, en los casos expresamente previstos en este título. **Cualquier matrimonio entre personas del mismo sexo o transexuales contraído en otras jurisdicciones, no será válido ni reconocido en derecho en Puerto Rico.**(Énfasis suplido)

El matrimonio es un contrato en virtud del cual **un hombre y una mujer** se obligan mutuamente a ser esposo y esposa. Cualquier matrimonio entre **personas del mismo sexo o transexuales** contraído en otra jurisdicción, **no es válido ni**

---

[25] 31 L.P.R.A. sec. 221.

**reconocido** como válido en Puerto Rico. Incluir o hacer constar, como pretende el peticionario, los resultados externos de una intervención quirúrgica en el área de los genitales de su cuerpo en el asiento del Registro Demográfico, donde se registró su nacimiento, permitiría que se realicen los matrimonios entre personas del mismo sexo, una de ellas transexual, cuando la condición cromosómica y biológica de éste último no se ha demostrado que fuera alterada con evidencia pericial y científica. Para todos los efectos legales, se trataría de un matrimonio entre personas del mismo sexo, en abierta violación a la prohibición estatutaria.

A pesar de que el referido estatuto hace referencia a la prohibición de contraer matrimonio entre personas del mismo sexo o transexuales **en otras jurisdicciones**, resulta obvio que dicha prohibición es extensiva a matrimonios de ese tipo que se celebren en Puerto Rico. Interpretar el estatuto como que la referida prohibición no incluye a los matrimonios de ese tipo celebrados en Puerto Rico, sería absurdo. Ese  estatuto prohíbe la celebración de matrimonios entre personas del mismo sexo o transexuales en Puerto Rico. Contiene un claro mandato sobre la invalidez de ese tipo de matrimonio, de celebrarse.

Autorizar la oficialización del cambio de sexo en los documentos del Estado, en casos como el presente, abre la puerta para la concesión de adopciones de menores de edad por parejas adoptantes del mismo sexo, acción que opera en contra

de los valores y normas jurídicas vigentes en nuestra jurisdicción.

Otra consecuencia de permitirse un cambio de sexo en los documentos oficiales del Estado, es el detrimento que esto tendría sobre la certeza y confiabilidad de la que gozan actualmente esos documentos, muy en particular el certificado de nacimiento, expedido por el Registro Demográfico de Puerto Rico. El certificado de nacimiento es quizás el documento personal más importante que emite el Gobierno en Puerto Rico. A través de ese documento, el ciudadano en Puerto Rico comienza a obtener el cúmulo de documentos que usualmente poseemos, y que utilizamos para establecer nuestra identidad en todo tipo de transacciones oficiales. Si permitiéramos oficializar en el asiento del nacimiento de una persona en el Registro Demográfico un supuesto cambio de sexo, que en realidad no ha sido acreditado con prueba científica, le estaríamos restando certeza y confiabilidad a un documento tan importante como lo es el certificado de nacimiento emitido por esa agencia. Esto tendría graves consecuencias con relación a asuntos locales, nacionales e internacionales de nuestros ciudadanos, pues estos documentos son evidencia indispensable de su identidad, y ya no gozarían de la certeza y confianza que hoy se les concede.

El aspecto psicológico y emocional de un ser humano no altera los componentes cromosómicos, hormonales y genéticos que determinan el sexo. El sexo es una cualidad de la persona. Cuando una persona, que nació varón, pretende asumir

un rol femenino, es meramente una forma particular de vivir su propia sexualidad. Al someterse una persona a una intervención quirúrgica, como la del presente caso, sólo obtiene una simple apariencia externa de cambio en el área de sus genitales, mientras no se demuestre con prueba pericial y científica lo contrario.

Los fundamentos antes expuestos, además, de los impedimentos establecidos por la Ley del Registro Demográfico de Puerto Rico, *supra*, constituyen una barrera al reconocimiento al llamado cambio de sexo, en los documentos oficiales del Estado como resultado de una intervención quirúrgica, como la del presente caso.

IV

Por los fundamentos expuestos estamos conforme con el resultado a que llega el Tribunal y los fundamentos utilizados para sostenerlo, a tenor con la Ley del Registro Demográfico de Puerto Rico, *supra*.


**Efraín E. Rivera Pérez**
**Juez Asociado**

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Alexis Delgado Hernández

    Peticionario

    Ex Parte                  CC-2004-708    Certiorari

Opinión Disidente emitida por el Juez Asociado SEÑOR FUSTER BERLINGERI.

"The force of precedent in the law is heightened by that almost universal sense of justice which urges that all men are properly to be treated alike in like circumstances".

    Karl Llewellyn

"Mira, Sancho... Cuando pudiere y debiere tener lugar la equidad, no cargues todo el rigor de la ley al delincuente; que no es mejor la fama del juez riguroso que la del compasivo."

Consejo de Don Quijote de la Mancha a Sancho en ocasión de la gobernación de la Insula de Barataria.

San Juan, Puerto Rico, a 30 de junio de 2005.

El asunto del que trata el caso de autos fue resuelto ya por este Tribunal en Andino Torres, Ex-parte, 151 D.P.R. 794 (2000). Conforme a una imperiosa tradición jurídica, que atañe a la propia esencia del proceso judicial, una vez hemos resuelto un asunto de determinada manera, la pauta que rigió en ese primer caso debe regir también para todos los otros casos iguales o similares que surjan posteriormente. Fundamentales consideraciones de trato igual, y sobre la

estabilidad y la certidumbre que debe tener el Derecho, informan la referida tradición, que abarca cualquier decisión novel nuestra, aunque se anuncie sólo mediante una sentencia. Por ser tan fundamentales las razones referidas, baluartes contra la arbitrariedad y la confusión, hemos resuelto que una decisión nuestra sobre determinado asunto no debe ser variada en casos posteriores en que dicho asunto se vuelva a plantear, a menos que nuestra decisión anterior haya sido **"tan manifiestamente errónea que no puede sostenerse sin violentar la razón y la justicia"**. Capestany v. Capestany, 66 D.P.R. 764 (1976). San Miguel & Cía. v. Guevara, 64 D.P.R. 966, 974 (1946); Banco de Ponce v. Iriarte, 60 D.P.R. 72, 79 (1942); García Fernández, Ex Parte, 44 D.P.R. 296 (1932).

La mayoría del Tribunal ahora se ampara en una mera política gerencial de este Foro, en la provinciana distinción entre una **sentencia** y una **opinión**, para resolver el caso de autos en forma contraria a como decidimos el de Andino Torres, Ex parte, *supra*. Acude a la excusa simplista de que nuestra decisión en ese caso fue sólo una sentencia y por lo tanto que no estamos obligados por ella. Lo que la mayoría no hace es explicar qué diferencias, si algunas, existen entre los hechos del caso de autos y los de Andino Torres, Ex Parte que **justifique una decisión en el caso de autos contraria a la de aquél**. La mayoría del Tribunal parece no darse cuenta de que si este Foro o cualquier otro puede decidir casos esencialmente idénticos en formas

dispares, **entonces no prevalece el Derecho, prevalece la arbitrariedad**. La esencia del imperio de la ley en cuanto a la función judicial es precisamente el **trato igual de los casos similares**. Se trata de la piedra angular sobre la cual se erige cualquier sistema judicial legítimo y la confianza del pueblo en la justicia, proclamado así por los más grandes juristas de nuestro tiempo, tales como Cardozo[26], Brandeis[27], Llewellyn [28], Pound [29] y Bodenheimer [30]. Ese principio fundamentalísimo lo hemos aplicado expresamente en Puerto Rico desde hace casi cien años. Véase Delgado v. Pimentel, 20 D.P.R. 556 (1914). Se extiende a todas las **decisiones judiciales**, sin que importe si éstas se emiten mediante sentencias u opiniones.

La mayoría apoya su racionalización de un gran dislate en Rivera Maldonado v. E.L.A., 119 D.P.R. 74 (1987). Allí ciertamente hicimos una distinción sobre el valor como precedente que existe entre nuestras sentencias y nuestras opiniones. **Pero también explicamos claramente la razón de economía judicial, y no de autoridad o legitimidad, en que se basa esa distinción**, algo que la mayoría del Tribunal ha ignorado al apoyarse en dicha decisión ahora. Explicamos entonces que como regla general en nuestras opiniones,

---

[26] B. Cardozo. The Nature of the Judicial Process (New Haven, 1921) pág. 149.

[27] Burnet v. Coronado Oil & Gas Co., 285 US 393, 406 (1932).

[28] "Case Law", Encyclopedia of the Social Sciences, III, p. 249.

[29] R. Pound, The Theory of Judicial Decision, 36 Harvard L. Rev. 641 (1923).

[30] E. Bodenheimer, Jurisprudence, (Harvard Univ. Press, 1962) p. 193.

mediante las cuales atendemos los asuntos que requieren pautarse, **"se consideran ampliamente las cuestiones envueltas y se fundamentan con razonamientos, precedentes explicados y tratadistas reconocidos"**. En cambio, las sentencias se utilizan **"para disponer lo más rápidamente posible del enorme número de casos que [el Tribunal] tiene que resolver"**, aquellos que plantean **"cuestiones reiteradamente resueltas por este Tribunal"**. Estas sentencias, que evidentemente no utilizamos de ordinario para resolver cuestiones __noveles__, tienen __"el valor persuasivo intrínseco de sus fundamentos"__, Rivera Maldonado v. E.L.A., *supra*, pág. 80. Son, pues, una de las dos variantes ordinarias de nuestro quehacer judicial: un tipo de dictamen del Tribunal que usualmente no tiene una extensa exégesis del Derecho aplicable pero que tiene fuerza de ley, y que en algunas ocasiones ordenamos publicar.

Con arreglo a lo anterior, para hacer caso omiso de nuestra decisión en Andino Torres, Ex Parte, que fue publicada, la mayoría ha debido explicar al menos porqué le parecen erróneos sus fundamentos, sobre todo en vista de que mediante dicha decisión se resolvió __una cuestión novel__. La sentencia de Andino Torres, Ex Parte incorporó por referencia expresa los fundamentos de la opinión concurrente que la acompaña, por lo que la mayoría del Tribunal ahora debería señalar porqué los estima erróneos. Véase Am. Railroad Co. v. Comisión Industrial, 61 D.P.R. 324, 326 (1943). Sin embargo, la mayoría del Tribunal __no explica__ en el caso de autos porqué considera errada nuestra anterior decisión en Andino Torres,

Ex Parte. Y, como ya indicamos, tampoco señala qué diferencias, si algunas, existen entre los hechos de dicha decisión y los de autos que justifiquen llegar a un resultado distinto. Por ende, es claro que **la mayoría no ha formulado razón meritoria alguna en virtud de la cual sea legítimo hacer caso omiso de nuestro dictamen anterior sobre el asunto que aquí nos concierne**.

La mayoría del Tribunal en el caso de autos ha debido resolver como lo hicimos en Andino Torres, Ex-parte, *supra*. Nuestra decisión allí no fue manifiestamente errónea; **ni mucho menos violentaría la razón y la justicia resolver el caso de autos tal como lo hicimos en el caso anterior.** Aquella decisión fue criticada severamente por algunos sectores religiosos del país **y así pagamos el precio que tiene ejercer nuestra fundamental misión judicial con verticalidad**. Pero este Foro no puede amilanarse por mor de esa crítica. Yo, por lo menos, como Juez no puedo dar marcha atrás sólo porque unos poderosos sectores de la opinión pública estén en desacuerdo con la manera en que cumplo con un deber de consciencia, sobre todo cuando tengo razones para creer que la crítica referida ni siquiera ponderó con objetividad los sólidos fundamentos de nuestra anterior decisión.

II

Para concluir este breve disenso, creo menester resaltar dos puntos sobre el asunto que aquí nos concierne. El primero es relativo al grupo de personas a que pertenece el

peticionario Alexis Delgado. Los **transexuales** como él deben distinguirse de otros grupos con los cuales erróneamente se les confunde, tales como los **travestistas**, los **intersexuales**, los **homosexuales** y los **bisexuales**. Véase, T. Flynn, Transforming the Debate: Why we need to Incluye Transgender Rights in the Struggles for Sex and Sexual Orientation Equality, 101 Columbia Law Rev. 392 (2001). Los transexuales son personas **muy distintas** de las otras, reconocidos así no sólo por las ciencias de la medicina y de la psiquiatría sino también por tribunales [31] y en la literatura profesional jurídica [32]. El transexual sufre de una **conocida condición médica**, para la cual se han desarrollado diversas terapias y tratamientos particulares pertinentes sólo a ellos. Tales personas transexuales sufren de la grave discordancia de sentir con todo su ser que son hombre o mujer a pesar de que sus rasgos anatómicos son del sexo contrario. La literatura científica está llena de estudios y monografías sobre esta anómala condición, que resaltan la **angustiosa existencia** que tienen los que la padecen, llevando a algunos de ellos al suicidio, o al menos al intento de quitarse la vida. Lo más que desean estas personas transexuales es poder enderezar el

---

[31] Véase el señalamiento sobre el particular en Littleton v. Prange, 9 S.W.3d 223, 226 (1999) en que el tribunal supremo de Texas resuelve en contra de un transexual pero reconoce que su condición es distinta a la de un homosexual.

[32] La condición de los transexuales y su particularidad ha sido objeto de numerosas monografías eruditas en el campo del Derecho. Sólo a modo de ilustración, véase M. Bell, Transexuals and The Law, 98 Nw. U.L. Rev. 1709 (2004); M. Aubin, Comments, 82 Ore. L. Rev. 1155 (2003).

involuntario trastorno de identidad sexual que sufren, para así poder integrar su existencia y **vivir de la forma más normal posible**. Su condición de transexual como tal nada tiene que ver, por ejemplo, con la inclinación de los travesti a vestirse con ropas del sexo contrario, o con la inclinación de los homosexuales a las relaciones íntimas con personas del mismo sexo, sino todo lo contrario.

El segundo punto que debe resaltarse es que favorecer la particular solicitud de Alexis Delgado en este caso sólo significa, en mi opinión, que no hay fundamentos jurídicos suficientes que justifiquen aquí **agravarle la vida al peticionario**, como ha de suceder como resultado de la decisión mayoritaria.

**Es muy importante tener en cuenta claramente qué es lo que está ante nuestra consideración en este caso; qué es exactamente lo que se nos solicita**. Lo que procura Delgado en este caso es **únicamente** que se modifique un aspecto de su identidad en dos documentos legales: su certificado de nacimiento y su licencia de conducir vehículos de motor. Es decir, se nos pide que se **enmienden dos documentos para que su identificación sexual en ellos coincida con su apariencia física actual**. Es fácil entender la gran necesidad que Delgado tiene de lograr la modificación de documentos que solicita. Basta pensar en el **lío que ha de ocurrir**, por ejemplo, si es detenido por un policía que le pide ver su licencia de conducir en la cual su identificación sexual no corresponde a su actual apariencia física; igual sucedería si

va a abrir una cuenta en un banco, o a solicitar un empleo, o a tantas otras gestiones cotidianas en las que tiene que producir algún documento de identificación.

El peticionario se había realizado ya la operación de cambio de sexo antes de acudir a este Tribunal. **Las nuevas circunstancias del peticionario son un dato irreversible que ya nadie puede remediar**. Sólo nos compete decidir si le facilitamos su vida ahora **en el modo específico en que se nos ha solicitado aquí** o si nos unimos a los que no les duele la angustiosa existencia que ha sufrido este ser humano por su largo trastorno de la identidad sexual, angustiosa existencia que **ha de continuar sufriendo** por razón de la decisión mayoritaria.

Para mí resulta claro el curso de acción que por razones de Derecho y de solidaridad humana deberíamos tomar.[33] Sobran los fundamentos jurídicos para acceder a lo que se nos solicita, conforme a lo que resolvimos en Ex-parte Andino, *supra*. No hacerlo no sólo constituye el injustificado y ominoso abandono de un precedente nuestro sino además el rechazo a compadecernos de la honda desdicha de un ser humano. Se falta así tanto a la justicia como a un deber de solidaridad.

En resumen, no estamos decidiendo ahora aquí si son válidos o no los llamados "matrimonios" de homosexuales o las llamadas uniones de hecho de personas del mismo sexo, ni ningún otro escabroso asunto similar. Sólo se trata aquí de

---

[33] Véase, La Solidaridad en el Proceso Judicial, 41 Revista de Derecho Puertorriqueño, Núm. 1, Pág. 1 (2002).

ayudar a un ser humano que ha sufrido una angustiosa existencia a que su vida futura sea un poco más llevadera, mediante la modificación de dos documentos particulares. Lamento que la mayoría del Tribunal no comparta esta visión, y disiento de su dictamen.



Jaime B. Fuster Berlingeri
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Alexis Delgado Hernández

Peticionario

Ex-Parte

Certiorari

CC-2004-708

Opinión Disidente emitida por la Jueza Asociada SEÑORA FIOL MATTA

En San Juan, Puerto Rico, a 30 de junio de 2005.

Hace cinco años, este Tribunal tuvo ocasión de resolver una controversia idéntica a la que nos presenta este caso. Lo hizo mediante sentencia publicada, a favor de lo solicitado. Dispusimos, en ese caso, que el Registro Demográfico podía enmendar el certificado de nacimiento de un ser humano transexual[34] que se

---

[34] Según el *Diccionario de Medicina de la Facultad de Medicina de la Universidad de Navarra*, pág. 1200 (2001) el transexualismo es un "[t]rastorno de la identidad sexual que consiste en el deseo de vivir y ser aceptado como un miembro del sexo opuesto. Suele acompañarse por sentimientos de malestar o desacuerdo con el sexo anatómico propio y con la intención de someterse a un tratamiento quirúrgico u hormonal para hacer que el propio cuerpo concuerde, lo más posible, con el sexo preferido." En casi todas las sociedades y épocas han existido personas que desarrollaban trabajos o incluso se relacionaban socialmente como si fueran de un sexo distinto. Cristina Garaizabal Elizalde, *Problemas de diagnóstico en los casos de transexualida*d, Revista de Psicoterapia, Núm. 40 (1999).

había sometido a una operación de reasignación de sexo.[35]

Ex Parte Andino Torres, 151 DPR 794 (2000).[36] Hoy el péndulo se orienta en la dirección contraria. Sin embargo, nuestra conciencia jurídica nos obliga a hacer constar que coincidimos con el criterio pluralista anterior de este Tribunal y, en particular, con los fundamentos expuestos en la Opinión Concurrente emitida en ese caso por el Juez Asociado Negrón García, a la cual se unieron los Jueces Asociados señores Hernández Denton y Fuster Berlingeri.

La controversia que está nuevamente ante nuestra consideración nos ofrece la oportunidad de utilizar nuestra facultad adjudicativa para dictar una decisión amparada en los principios elementales de equidad y atemperar la interpretación de nuestras leyes a los adelantos de la ciencia moderna. Por entender que la Opinión Mayoritaria se niega injustificadamente a conceder el remedio solicitado, recurriendo a una interpretación excesivamente rígida del Derecho, respetuosamente disentimos.

I.

El 22 de diciembre de 2003 la peticionaria, quien fue inscrita al nacer con el nombre de Alexis Delgado

---

[35] Esta operación es completamente válida en nuestro sistema de derecho y no existe disposición alguna que la proscriba.

[36] Ex Parte Andino, supra, trataba solamente sobre una petición ex parte para que el nombre y sexo de una persona transexual operada fueran enmendados en el certificado de nacimiento, no se solicitaba que dicha información se enmendara de igual forma en la licencia de conducir. El asunto concerniente a la posibilidad de enmendar esta información en la licencia de conducir, planteado por la peticionaria, lo atenderemos en el acápite IV de nuestra Opinión Disidente.

Hernández, presentó ante el Tribunal de Primera Instancia una petición jurada para que se corrigiera su certificado de nacimiento respecto a su nuevo nombre, Alexandra Delgado Hernández, y su sexo, de masculino a femenino. Además, solicitó que se enmendara del mismo modo su licencia de conducir y su expediente en el Departamento de Obras Públicas. Junto a la solicitud, anejó su certificado de nacimiento, del cual se desprende que nació el 27 de octubre de 1970, fue inscrita en el Registro Demográfico el 16 de noviembre del mismo año bajo el nombre de Alexis y que fue identificada como un varón. Además, presentó prueba documental de que se había sometido a una operación de cambio de sexo. Esta prueba consistía de una declaración jurada del Dr. Stanley H. Biber, otorgada el mismo día de la operación, 23 de mayo de 2003, dando fe de que había operado a Alexandra en el Hospital Mt. San Rafael en Colorado. En específico, certificó que como consecuencia de esta operación **"the sex designation of the same person was changed completely from male to female."**

El 20 de enero de 2004 el foro de instancia ordenó a la peticionaria que sometiera una certificación negativa de antecedentes penales emitida a nombre de Alexis Delgado Hernández. Además, concedió término al Ministerio Fiscal para que se expresara respecto a la solicitud de corrección de acta. **Especificó que de no hacerlo, el tribunal entendería que se allanaba a la petición.** La parte peticionaria sometió oportunamente la certificación solicitada, **pero el Ministerio Fiscal nunca compareció**

**para expresar su posición.**[37] Finalmente, el 23 de febrero

de 2004 el tribunal de instancia emitió una resolución,

en la que declaró lo siguiente:

> Este Tribunal ORDENA al Registro Demográfico
> corregir el asiento de inscripción de
> nacimiento de la peticionaria para que aparezca
> que su sexo es FEMENINO y que su nombre es
> ALEXANDRA DELGADO HERNÁNDEZ, nombre con el cual
> es conocida y que es el que ha escogido para
> usar conforme a su nueva realidad. También
> ordena al Departamento de Transportación y
> Obras Públicas, Negociado de Vehículos de
> Motor, realizar los cambios correspondientes en
> términos de nombre y sexo en la licencia de
> conducir.

Luego de dictada la referida resolución y casi tres

meses después del término concedido por el Tribunal de

Primera Instancia para que el Ministerio Público

compareciera, el Fiscal de Distrito solicitó a la

Secretaria General de ese tribunal copias de los

documentos en el expediente. El 12 de abril de 2004

presentó una petición de certiorari ante el Tribunal de

Apelaciones solicitando la revocación de la resolución

emitida. Once días después, el 23 de abril de 2004 ese

foro expidió el auto solicitado y concedió término a la

parte recurrida, aquí peticionaria, para someter su

alegato. Finalmente, el 22 de junio de 2004 el Tribunal

de Apelaciones dictó sentencia revocando en su totalidad

la decisión del tribunal de instancia.

El 5 de agosto de 2004, la parte peticionaria

presentó la petición de certiorari que nos ocupa. Como

único error señaló que el foro apelativo intermedio se

equivocó al revocar la resolución del tribunal de

---

[37] Este hecho denota una falta de diligencia crasa de la parte recurrida, que si consideraba, como ahora plantea ante nosotros, que el asunto reviste gran importancia, debió cumplir con la orden dentro del término concedido originalmente.

instancia y negarle su solicitud para que se enmendaran las actas de su certificado de nacimiento y su licencia de conducir. Expedimos el auto de certiorari y el recurso quedó sometido una vez el Procurador General presentó su alegato, el 3 de marzo de 2005.

II.

Suscribimos en su totalidad la Opinión Concurrente emitida en Ex Parte Andino Torres, supra, por el entonces Juez Asociado señor Negrón García junto al hoy Juez Presidente señor Hernández Denton y el Juez Asociado señor Fuster Berlingeri.[38] Ésta examinó detenidamente las disposiciones de la Ley del Registro Demográfico, Ley Núm. 24 de 22 de abril de 1931, que regulan las enmiendas a la información contenida en el Registro. Concluyó que la Ley contenía una laguna respecto a las enmiendas por cambio de sexo y que este Tribunal venía obligado a llenar esa laguna, aplicando la equidad, según requiere el Art. 7 del Código Civil, 31 LPRA § 7:

> El Tribunal que rehúse fallar a pretexto de **silencio, obscuridad, o insuficiencia de la ley**, o por cualquier otro motivo, incurrirá en responsabilidad.

---

[38] Ex Parte Andino Torres, supra, en las págs. 797-811. La Jueza Asociada Naveira de Rodón concurrió con el resultado de la decisión "por entender que ésta se limita a interpretar el concepto 'sexo' dentro del contexto específico de este caso, en cuanto a realizar un cambio en la constancia que aparece en el Certificado de Nacimiento que se expide por el Registro Demográfico. Ésta es un área que tiene que irse desarrollando caso a caso y la sentencia que hoy se certifica, no debe entenderse como que se proyecta más allá del cambio que autoriza." Id. en la pág. 796. El Juez Asociado señor Rebollo López emitió una opinión disidente a la que se unió el Juez Presidente señor Andréu García. El Juez Asociado señor Corrada del Río emitió una opinión disidente.

> Cuando no haya ley aplicable al caso, el
> tribunal resolverá conforme a **equidad**, que
> quiere decir que se tendrá en cuenta la razón
> natural de acuerdo con los principios generales
> del derecho, y los usos y costumbres aceptados
> y establecidos. (Énfasis nuestro).

Al aplicar este artículo al presente caso, debemos precisar, de entrada, dos conceptos fundamentales. El primero es el concepto base o elemento *sine qua non* de "silencio, obscuridad o insuficiencia de la ley"; el segundo es, precisamente, el principio de "equidad", con su enorme riqueza normativa y ética.

Hace medio siglo, Felipe Clemente de Diego, en un discurso publicado por la Real Academia de Jurisprudencia y Legislación de Madrid, abordó el tema de las llamadas "lagunas" en la ley, que es lo que el artículo 7 de nuestro Código denomina "silencio, obscuridad, o insuficiencia" de ésta.[39] En una extensa discusión que hoy conserva la misma vigencia y pertinencia, el insigne tratadista concluye como sigue:

> Parece, pues, que la palabra laguna representa
> en nuestro espíritu algo que falta en una cosa
> o serie que quebranta, rompe o detiene su
> continuidad, limitando su extensión y contenido
> y quedando por ello incompleta e insuficiente.
> (…) **Con toda propiedad también se aplica a la
> ley que en la regulación de las relaciones de
> la convivencia social y de sus posibles
> conflictos no contenga una disposición
> necesaria o conveniente para la protección de
> los intereses de la Comunidad o de sus
> miembros.** Felipe Clemente de Diego y Gutiérrez,

---

[39] A pesar de que algunos estudiosos niegan la posibilidad de lagunas en la ley,[39] "el propio legislador reconoce la existencia de lagunas cuando, en defecto de ley o de costumbre aplicable, remite al Juez a los principios generales del Derecho." Guillermo García Valdecasas, *Parte General del Derecho Civil Español*, pág. 115 (1983). Véase, por ejemplo, Diego Espín Cánovas, Manual *de Derecho Civil Español*, Vol. I, en las págs. 129 y ss. (1968).

*De las Lagunas de la Ley*, págs. 39-40 (1945).[40]
(Énfasis nuestro).

Las lagunas ocurren debido a que "la ley pocas veces
nace perfecta, completa, de la mente del legislador, como
la experiencia en todas las épocas ha comprobado. Y aún
naciendo perfecta, con aquella perfección relativa a las
obras humanas, muy pronto se advierte su insuficiencia."
Id. en la pág. 54. El autor amplía este concepto al
afirmar:

> El legislador, aun con su experiencia y extensa
> visión del conjunto de los principios jurídicos
> y del complejo de las relaciones sociales, aun
> sabedor de las necesidades sociales de su
> pueblo, no puede comprender en su ley, para
> regularlos, todos los casos y problemas que
> puedan presentarse en la vida. De un lado, su
> atención recae sobre los hechos y casos más
> importantes y frecuentes que suelen
> presentarse, y con ello no agota las
> posibilidades ni regula por tanto, ni tiene en
> cuenta las variadísimas circunstancias con que
> pueden presentarse. Id. en la pág. 10.

Entre las circunstancias sobre las que la ley calla,
están aquellas que se deben no solo a la falta de
previsión del legislador sino **"a un cambio posterior de
la realidad social que plantea cuestiones imposibles de
resolver cuando se dictó la ley."** Guillermo García
Valdecasas, *Parte General del Derecho Civil Español*,
págs. 115-116 (1983).[41] En este sentido, la ley no es la
totalidad del Derecho, sino una expresión incompleta de

---

[40]    Puig Brutau no favorece el término de "laguna" de la
ley. Según explica, "sería más adecuado hablar de
imperfección legal o falta de previsión de las normas
promulgadas." Señala también que el concepto corresponde
en inglés al "*unprovided case* o caso no previsto, o de
*case of first impression*, caso que se presenta por
primera vez." José Puig Brutau, *Fundamentos de Derecho
Civil*, Tomo Preliminar, Segunda Edición, pág. 309 (1989).

[41]    Para una exposición detallada de otros supuestos en
que pueden presentarse lagunas legales, véase Puig
Brutau, supra, en las págs. 309-316.

éste. Felipe Clemente de Diego, supra, en la pág. 53. Los vacíos que se presentan en la ley y que generalmente se denomina "lagunas" son el supuesto necesario para que se forme y reconozca el Derecho judicial en sentido estricto. Es aquí donde se manifiesta la iniciativa de jueces y tribunales, que perfilan, moldean y adaptan la ley a esas nuevas situaciones. Id. en la pág. 8.

Este Tribunal tiene la obligación de llenar las lagunas existentes en la ley, conforme al mandato del artículo 7 del Código Civil, en tanto éste nos requiere que en ausencia de ley aplicable al caso resolvamos conforme a equidad y tratemos de armonizar las disposiciones de ley que estén o parezcan estar en conflicto.[42] Por eso, si aparecen lagunas en un estatuto, éstas se suplirán a través de la jurisprudencia. Olmo v. Young Rubicam, 110 DPR 740 (1981). En Pueblo v. Ortega Santiago, 125 DPR 203, 214 (1990), abundamos sobre el particular y expresamos:

> Los tribunales estamos autorizados a interpretar las leyes cuando, entre otras, éstas no son claras o concluyentes sobre un punto en particular; cuando el objetivo, al realizarlo, es el de suplir una laguna en la misma; o cuando, con el propósito de mitigar los efectos adversos de la aplicación de una ley a una situación en particular, la justicia así lo requiere.

Al hablar de equidad tenemos que tomar en consideración que se trata de un principio que ha regido

---

[42] Asoc. de Condómines v. Los Frailes, 2001 TSPR 116 en la pág. 6. Véanse Corraliza v. Bco. Des. Eco., res. 9 de enero de 2001, 2001 TSPR 2, 153 DPR ___ (2001); Flores v. Meyers Bros. of P.R., 101 DPR 689 (1973); Robles Estolaza v. UPR, 96 DPR 583 (1968).Collazo Cartagena v. Hernández Colón, 103 DPR 870 (1975). Véase además Asociación de Farmacias de la Comunidad v. Departamento de Salud, res. el 23 de mayo de 2002, 156 DPR ___ (2002), 2002 TSPR 69.

el Derecho desde hace más de veinte siglos. Según Aristóteles, la equidad es una expresión de lo justo, pero no como lo es la ley, sino a modo de "rectificación de la justicia", es decir, la rectificación de los resultados injustos de su aplicación al caso particular. Antonio Hernández Gil, *Conceptos Jurídicos Fundamentales, Obras Completas*, Tomo 1, pág. 72 (1987). Según el filósofo, el Derecho debe ser complementado por la equidad y la regla general por la excepción, para poder alcanzar siempre una solución justa en el plano humano. José Puig Brutau, *Fundamentos de Derecho Civil*, Tomo Preliminar, Segunda Edición, pág. 309 (1989). Esta discusión aristotélica sobre la interpretación de las leyes utilizando la equidad influyó, no solamente en los juristas romanos,[43] sino que a través de Santo Tomás de Aquino[44] ha influido en todo el mundo occidental.  Id. Véase también, <u>Silva v. Comisión Industrial</u>, 91 DPR 891, 899 (1968).

Por su facultad moderadora de la rigidez de la ley, el término "equidad", que se define de diversos modos, en ocasiones se utiliza como sinónimo de justicia.[45] García

---

[43]    En el Derecho Romano la equidad caracterizaba las normas que consideraban las circunstancias del caso particular ("Ius aequum") versus las que no admitían que se consideraran tales circunstancias ("Ius strictum"). García Valdecasas, supra en la pág. 118

[44]    Para una discusión sobre el significado de la obra de la escolástica de Santo Tomás, véase Hernández Gil, supra en las págs. 75-82.

[45]    Por eso se ha dicho que: "Las ciudades y todas las agrupaciones de seres humanos están unidas entre sí por el aglutinante de la equidad, que es la conservadora y el alma de toda sociedad humana." Luis Legaz y Lacambra, *El Derecho y el Amor*, pág. 113 (1976), nota al calce 33, citando a Luis Vives, *De tradendis disciplinis*, trad. Esp. De L. River, en la edición de las Obras completas, T. II, Madrid, Aguilar, pág. 1948 (1948).

Valdecasas, supra en la pág. 118 (1983). Así, "[u]na solución equitativa es la que parece adecuada o correcta en circunstancias determinadas, como algo que corresponde a la justicia natural." Puig Brutau, supra en las págs. 332 (1989).

Es asunto trillado que las normas generales, por su generalidad y abstracción intrínsecas, no pueden prever todas las circunstancias de las situaciones de hechos que caerán bajo sus dominios. García Valdecasas, supra en la pág. 118 (1983). Por eso, **"una aplicación rigurosa de la norma general que no tome en consideración las particularidades de cada situación concreta, puede conducir, en ocasiones, a resultados injustos.** Para evitarlo, la equidad exige tener en cuenta dichas particularidades, derivando de la norma general la norma individual justa y adecuada al caso concreto." Id. en la pág. 119. En ocasiones, esto es necesario porque la norma general pierde concordancia con la situación regulada y ya no está debidamente ajustada a la necesidad actual: "La equidad en este caso tiene otro sentido porque puede anunciar un Derecho nuevo, mejor que el proclamado por la norma vigente. En este supuesto la equidad significa una reflexión sobre la misión del Derecho, o como ha dicho PRINGSHEIM, **la equidad es la conciencia del Derecho."** Puig Brutau, supra en la pág. 333, énfasis nuestro.

Por último, es vital aclarar que al utilizar la equidad para llenar una laguna en la ley los tribunales no usurpamos la función del legislador. Más bien, utilizamos los principios que informan la ley aplicable para derivar una norma que permita resolver una nueva situación, que si bien está dentro del ámbito de la ley,

no está contemplada por ésta en su particularidad. Así, la misión del juez al amparo del artículo 7 no es legislar, sino extraer una norma para el caso particular, de lo ya ha normado para el caso general. Si los tribunales abdican de esta función "las situaciones sociales dignas de protección habían de quedar desamparadas, infligiendo grave daño a los interesados y aun al mismo bien común; y no hay que decir que también a los juzgadores se les pondría en el duro trance de denegar amparo o protección a tales situaciones...." Clemente de Diego, supra, en la pág. 31.

III.


El certificado de nacimiento es un documento oficial expedido y custodiado por el Estado que incluye, entre otros datos, el nombre y sexo de la persona inscrita, la fecha y lugar de su nacimiento, el nombre y edad de sus padres y el lugar de nacimiento de éstos. Este certificado se usa para autenticar la identidad de una persona y su nacionalidad y también para obtener otros documentos oficiales del gobierno. Aquí descansa la importancia para toda persona de que los datos en el certificado de nacimiento sean correctos, para que también lo sean los demás documentos que descansan en esa información.

La primera laguna legal que debemos subsanar se encuentra en el artículo 31 de la Ley de Registro Demográfico, supra, 24 LPRA §1231, específicamente en el procedimiento para enmendar el certificado de nacimiento:

Disponiéndose, que las omisiones o incorrecciones que aparezcan en cualquier certificado antes de ser registrado en el Departamento de Salud podrán ser salvadas insertando las correcciones o adiciones necesarias en tinta roja en dicho certificado, pero **luego de haber sido archivado** en el Departamento de Salud, no podrá hacerse en los mismos rectificación, adición ni enmienda alguna que altere sustancialmente el mismo, **sino en virtud de orden del Tribunal de Distrito, cuya orden, en tal caso, será archivada en el Departamento de Salud haciendo referencia al certificado a que corresponda** (...). (Énfasis nuestro).

A continuación, el artículo 31 describe el procedimiento para obtener la orden judicial que permite enmendar el registro. Este, entre otras cosas dispone lo siguiente:

El auto en que se autorice la rectificación o enmienda de un asiento en el antiguo Registro Civil se inscribirá mediante anotación extendida en debida forma al margen de la inscripción rectificada. La rectificación, adición o enmienda de un certificado ya archivado en el Registro General Demográfico se hará insertando en él las correcciones, adiciones o enmiendas autorizadas por el tribunal. **Las tachaduras que fueren necesarias se harán de modo que siempre se pueda leer la palabra tachada.**

El cambio, adición o modificación de nombre o apellido sólo podrá hacerse a instancia del interesado, quien deberá presentar ante cualquier Sala del Tribunal de Distrito la oportuna solicitud, expresando bajo juramento los motivos de su pretensión, acompañada de la prueba documental pertinente en apoyo de su solicitud. Copia de la solicitud y de toda la prueba documental le será remitida al Ministerio Fiscal simultáneamente con su radicación.

Transcurridos 10 días desde la remisión y notificación al Ministerio Fiscal, sin que éste haya formulado objeción alguna, el tribunal entenderá y resolverá los méritos de la petición sin necesidad de celebrar vista o discrecionalmente podrá celebrar vista de estimarlo procedente y dictará el auto que proceda. (Énfasis nuestro).

Finalmente, el artículo 31 establece el procedimiento interno sobre la forma en que se enmendarán las correcciones ordenadas mediante orden judicial:

> El auto en que se autorice el cambio, adición o modificación de nombre o apellido se inscribirá en el antiguo Registro Civil mediante anotación extendida al margen de la inscripción de nacimiento del interesado y al margen de la partida de su matrimonio. El cambio, adición o modificación de nombre o apellido se verificará en el Registro General Demográfico tachando en el certificado de nacimiento y en la certificación de la celebración del matrimonio del interesado el nombre o apellido sustituido y consignando el nuevo nombre o apellido autorizado por el tribunal. **Las tachaduras se harán de modo que siempre pueda leerse** el nombre o apellido suprimido. (Énfasis nuestro).

Por su parte, el Reglamento del Registro Demográfico Número 316, sección 1071-19, regula las correcciones o alteraciones después de hecha la inscripción:

> Después que un certificado haya sido aceptado por el registrador, no podrá ser objeto de ningún cambio, borradura o alteración, así como tampoco la transcripción hecha en el libro de errores materiales de récord, **sin el debido procedimiento de ley.** Los errores materiales que aparecieren en cualquier certificado al ser presentado para inscripción o luego de haber sido inscrito, consistentes en la equivocación de un nombre, apellido, palabra o frase no esenciales, podrán subsanarse escribiendo correctamente con tinta roja la palabra o palabras erróneamente escritas o insertando la palabra o palabras omitidas. **Las tachaduras que fueren necesarias se harán de modo que siempre se pueda leer la palabra tachada.** Para efectuar dichas correcciones los registradores exigirán la prueba que, según los casos, estimen oportuna. (Énfasis nuestro).

La Opinión Mayoritaria hace una extensa descripción de la figura del Registro Civil español, basándose en tratadistas españoles. Sin embargo, aunque menciona varias sentencias del Tribunal Supremo de España que interpretan la Ley del Registro Civil, no explica que éstas han permitido que se enmienden **el nombre y el sexo**

de personas transexuales en certificados de nacimiento en el Registro Civil español.[46] Los jueces concurrentes en Ex Parte Andino, supra, llamaron nuestra atención a esta realidad jurídica del país de dónde, como señala la Opinión Mayoritaria, proviene nuestro sistema de Registro Demográfico. Así, explican que en España el Tribunal Supremo español ha resuelto reiteradamente:

> [Q]ue la enmienda de la anotación de sexo en el Registro Civil producto de una modificación quirúrgica no está contemplada en la Ley de Registro Civil, segundo, que esta omisión constituye una laguna en la ley que los tribunales deben superar aplicando la equidad y, tercero, **que de la aplicación de la equidad resulta permisible el cambio de la anotación de sexo en el Registro Civil.** Ex parte Andino Torres, supra, en la pág. 804. (Énfasis nuestro).

Al llenar las lagunas en las disposiciones que regulan las enmiendas al certificado de nacimiento, debemos tomar en cuenta cuál es la corriente actual. Son al punto, claro está, las sentencias españolas mencionadas. Además, recientemente la Corte Europea de Derechos Humanos reconoció el derecho de las personas transexuales a enmendar su certificado de nacimiento, en el caso de una persona transexual que nació varón pero se operó para vivir su vida como una mujer, Goodwin v. United Kingdom, 35 Eur. Ct. H.R. 18 (2002). En los Estados Unidos, la Administración de Seguro Social permite realizar un cambio en la designación de sexo en los expedientes del seguro social cuando se presente "clinical or medical record or other combination of

---

[46] Sentencias de 2 de julio de 1987, 15 de julio de 1988, 3 de marzo de 1989 y 19 de abril de 1991.

documents showing the sex change surgery has been completed."[47]

Hay una preocupación generalizada, reflejada tanto en la Opinión Mayoritaria, como en la sentencia del Tribunal de Apelaciones y el alegato del Procurador General, de que permitir las enmiendas solicitadas vulnera la naturaleza histórica del Registro y disminuye la utilidad del certificado para fines estadísticos.[48] Además, se especula sobre la posibilidad de fraude a terceros.

No compartimos estas preocupaciones. En primer lugar, según explicaron los jueces concurrentes en Ex Parte Andino, supra, "el carácter histórico del certificado es lo que compele la adopción de mecanismos

---

[47]    Order RM 00203.210, Changing Numident Data – Name Change, October 3, 2002. De igual forma, el Departamento de Estado de los Estados Unidos de América ha permitido enmendar tanto el nombre como el sexo en el pasaporte, si se cumplen con ciertos requisitos. Véase Megan Bell, *Transsexuals and the Law*, 98 Nw. U.L. Rev. 1709, 1738 (2004).

[48]    La Opinión Mayoritaria también menciona que este Tribunal ha resuelto que el procedimiento de enmienda o rectificación al certificado de nacimiento debe interpretarse restrictivamente. A esos efectos, se refiere a dos casos, uno de 1946, resuelto antes de enmendarse la Ley para permitir enmiendas al certificado y otro de 1980, cuyos hechos no guardan relación con lo que nos ocupa. Ex Parte Pérez 65 DPR 938 (1946) y León Rosario v. Torres, 109 DPR 804 (1980). Ambos casos son claramente distinguibles de la controversia que hoy estudiamos. Cabe señalar que al referirse a Ex Parte Pérez, supra, la Opinión Concurrente en Ex Parte Andino, supra, concluyó que era improcedente la interpretación restrictiva allí utilizada para negar el cambio de apellido de la parte peticionaria, pues aunque "la Ley de 1931 no disponía expresamente para el cambio de nombre, **tampoco lo prohibía.**" Evidentemente un análisis restrictivo nos alejaría de la metodología civilista que debe imperar en nuestro sistema jurídico y que nos ordena interpretar la ley utilizando la equidad. Pero, más importante aún, **en ninguno de estos casos había la posibilidad de violación a derechos fundamentales salvaguardados en nuestra Constitución**. Rechazamos una interpretación restrictiva en estas circunstancias.

de enmienda que, sin dejar de reflejar la condición del recién nacido, reflejen también los datos vitales de su historia. ¡Menuda historia sería la que cesara al nacer.!" Id. en la pág. 798. (Bastardillas omitidas). [49] Por otra parte, la Ley y el Reglamento del Registro Demográfico requieren que para enmendar el certificado de nacimiento original se utilicen tachaduras, lo que permite que la información original se conserve para fines estadísticos e históricos. De esta forma, se mantiene el documento histórico para el uso interno del Registro y se evita la alegada posibilidad de fraude a terceros[50] porque **la información original no desaparece, sino que es enmendada.**

La sentencia del foro apelativo que la Mayoría de este Foro confirma sostiene que la operación de reasignación de sexo no altera los cromosomas de la persona operada y que por tanto debemos concluir que la persona transexual realmente no cambia de sexo. Este argumento fue acogido en la Opinión de Conformidad

---

[49] Además, obsérvese el compromiso que se le impone al Registro Demográfico de consignar los datos tal cual son, **aún luego de certificados.** En específico, en el artículo 31 de la Ley del Registro Demográfico, supra, se consigna "que los certificados que se reciban mensualmente en su Departamento procedentes de los encargados de registros sean examinados cuidadosamente y requerirá la información adicional que sea necesaria en aquellos que aparezcan incompletos o defectuosos, **para lo cual toda persona que tenga conocimiento de hechos concernientes a cualquier nacimiento,** casamiento o defunción, **estará obligada a suministrar dicha información, cuando a ello sea requerida por el Secretario de Salud** en persona o por medio de su representante acreditado, por correo, o por conducto del Registrador del distrito." (Énfasis nuestro).

[50] "El transexual no tiene intención de defraudar a la sociedad sino, por el contrario, de corregir una disyuntiva de su personalidad que considera, por sí misma, fraudulenta." Ex parte Andino, supra en la pág. 809. (Bastardillas omitidas).

emitida por el Juez Asociado señor Rivera Pérez y se encuentra subyacente en la Opinión Mayoritaria.

Es cierto que la operación de reasignación de sexo no altera los cromosomas, pero esto nada tiene que ver con la naturaleza de la identificación de sexo que se realiza **a los únicos fines de emitir un certificado de nacimiento.** La determinación de sexo de un recién nacido se limita a la observación de la apariencia de los genitales, sin necesidad de un examen de laboratorio para determinar si los cromosomas del recién nacido corresponden a la apariencia exterior. Por tanto, en el Registro Demográfico se completa la información para marcar el encasillado correspondiente al sexo utilizando, como único y exclusivo criterio, la apariencia exterior.

No podemos requerir a las personas transexuales que solicitan enmendar su certificado de nacimiento un estándar diferente para probar su sexo del que se usa de ordinario. **En el caso específico de Alexandra, debemos utilizar el mismo estándar que se utilizó cuando la peticionaria nació hace 35 años, es decir, la apariencia de sus genitales y otras características perceptibles a la vista, según certificadas por un médico autorizado. <u>El médico que operó a Alexandra certificó que había hecho un procedimiento médico de reasignación de sexo.</u> Esto, unido a la expedición de un certificado negativo de antecedentes penales y una orden judicial es suficiente, en términos legales, para autorizar el cambio de sexo en el Registro Demográfico.**

Nuestro análisis de la Ley de Registro Demográfico nos lleva a concluir, contrario a la Opinión de la que disentimos, **que la descripción de enmiendas que contiene**

**la ley es *numerus apertus* y que no existe impedimento legal alguno para que el Registro Demográfico cumpla con la orden del foro de instancia de enmendar el sexo y el nombre de la peticionaria en su certificado de nacimiento.** La ley no prohíbe la enmienda solicitada, sino que contempla claramente la posibilidad de que los asientos del Registro sean enmendados. Por otra parte, el procedimiento de enmiendas mediante tachaduras nos permite derivar los principios a partir de los cuales elaborar la norma para el caso particular que nos concierne. De esa forma, la equidad y la propia ley nos llevarían a resolver que debemos autorizar la enmienda solicitada mediante el procedimiento de enmiendas al amparo del artículo 33 de la Ley Núm. 24 de 22 de abril de 1931.

IV.


Pasemos ahora a analizar si existe la posibilidad de que el Departamento de Obras Públicas enmiende el nombre y sexo de la peticionaria en su licencia de conducir y en sus expedientes en el Departamento de Transportación y Obras Públicas. **Este asunto no fue atendido por la Opinión Mayoritaria a pesar de que la parte peticionaria claramente lo plantea en su señalamiento de error.** Como veremos, aquí también existe una laguna que es preciso subsanar utilizando la equidad.

La Ley de Vehículos y Tránsito de Puerto Rico, Ley Núm. 22 de 7 de enero de 2000, no especifica qué proceso se ha de seguir si una persona está interesada en cambiar la información que aparece en su licencia de conducir.

Tan sólo se circunscribe a mencionar, en su artículo 3.14, que el procedimiento de renovación de licencias será establecido por el Secretario de Transportación y Obras Públicas mediante reglamento. Por su parte, el *Reglamento para establecer los requisitos para la expedición, renovación, cambio de categoría o de nombre, duplicado, reciprocidad de certificado de Licencia de Conducir y endoso especial para transportar materiales y sustancias peligrosas* (en adelante Reglamento) de 29 de diciembre de 2000, tampoco regula de manera específica el cambio de sexo en la licencia de conducir. Al igual que la Ley de Registro Demográfico, este Reglamento provee un procedimiento general de cambios en la información contenida en la licencia, en el cual incluye cambios de nombre, dirección y categoría. Art. VII, (G), (H) e (I). Para el cambio de nombre requiere lo siguiente:

1. Cumplir con los requisitos establecidos en Parte A, Requisitos Generales, de este Artículo, Incisos (5), (6), (7) y (9).[51]

2. Declaración Jurada firmada ante Notario Público Autorizado haciendo constar las razones que motivan su petición, la cual deberá estar acompañada de **uno** de los siguientes documentos:

   a)                    Escritura de Reconocimiento.
   b) **Sentencia o resolución del Tribunal.**
   c) **Certificado de Nacimiento.**
   d) Cualquier otro documento debidamente autenticado. (Énfasis nuestro).

De entrada, observamos que este reglamento tampoco prohíbe que se cambie la información correspondiente al

---

[51] Estos requisitos son:

5. Sellos de rentas internas según la transacción solicitada....
6. Dos (2) fotografías recientes ....
7. Certificado de ASUME, si aplica.
9. Satisfacer cualquier multa administrativa pendiente de pago. Reglamento, supra, Art. VII, A (5), (6), (7) y (9).

sexo del conductor. Además, el procedimiento de cambio de nombre establecido resulta igualmente adecuado para solicitar el cambio de sexo, para lo cual sería suficiente presentar tan sólo uno de los documentos enumerados, entre éstos una sentencia o resolución del tribunal o un certificado de nacimiento. Por tanto, no vemos impedimento legal para que, al interpretar esta insuficiencia de la ley utilizando la equidad, permitamos cambiar no sólo el nombre del conductor en la licencia, sino el encasillado correspondiente al sexo.

V.

Aunque la decisión mayoritaria sostiene que "no queda claro... cuáles son los fundamentos legales ... para mantener la validez de determinación del foro de instancia," la realidad es que la peticionaria comparece ante nosotros mediante un alegato que se basa en la esencia misma de la Justicia.[52] Claramente se ampara en nuestra Ley Suprema, la Constitución del Estado Libre Asociado de Puerto Rico, para reclamar su derecho a intimidad y dignidad, a la vez que se refiere a nuestra sentencia en Ex parte Andino Torres, supra y varias sentencias españolas, con ánimo de persuadirnos a reiterar el criterio que adoptamos entonces.[53] De esa forma, lo que pretende la petición es que utilicemos

---

[52] En la vida social "el hombre necesita del Derecho." Juan Vallet de Goytisolo, *Panorama del Derecho Civil*, Segunda Edición, pág. 7 (1973). "Se trata de una necesidad espiritual de Justicia, casi tan intensa como la necesidad material que del agua tiene el pez." Id.

[53] También utiliza como material persuasivo varios artículos relacionados con el tema.

nuestra facultad como intérpretes de la Constitución y de las leyes para interpretar una laguna en la ley.

Coincidimos con la Opinión Concurrente de los Jueces Asociados Negrón García, Hernández Denton y Fuster Berlingeri en Ex Parte Andino Torres, supra, en cuanto afirma que negarle a la peticionaria el derecho a enmendar su certificado de nacimiento (y en lo que respecta al presente caso, su licencia de conducir) **violaría los principios garantizados en las secciones 1 y 8 de nuestra Carta de Derechos, que protegen respectivamente el derecho a la dignidad e igualdad de todos los seres humanos y a su intimidad.**[54] Id. en las págs. 806-810. Cabe señalar en este sentido que la decisión de la Corte Europea en el caso de Goodwin v. United Kingdom, supra, se basó parcialmente en que negar una enmienda respecto al sexo de una persona transexual operada en el certificado de nacimiento violaba el artículo 8 de la Convención Europea para la Protección de Derechos Humanos y Libertades Fundamentales, que dispone, de forma similar a nuestra Constitución: "Everyone has the right to respect for his private and family life, his home, and his correspondence."

Ya establecimos firmemente que las secciones 1 y 8 de la Carta de Derechos de nuestra Constitución operan

---

[54] El Art. II sección 1 de la Constitución del Estado Libre Asociado dispone: "La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana." Por su parte, en el Art. II sección 8 de la Constitución del Estado Libre Asociado se establece: "Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada y familiar."

sin necesidad de ley que las implante. Figueroa Ferrer v. ELA, 107 DPR 250 (1978). [55] Ni la Ley del Registro Demográfico, ni el Reglamento del Departamento de Transportación, ni mucho menos las decisiones de este Tribunal pueden ir por encima de las disposiciones de nuestra Ley Suprema.

VI.

"La actividad del jurista se vuelve vana logomaquia o juego fútil de conceptos si, preocupándose únicamente por un extrínseco aunque hábil tecnicismo, pierde de vista el fin esencial que le ha sido asignado: la realización de la justicia." Luis Legaz y Lacambra, *El Derecho y el Amor*, pág. 113 (1976) citando a Del Vecchio, *Aspectos y problemas del Derecho*, Madrid, Espesa, págs. 284-85 (1967).

Las razones para impedir que una persona transexual cambie los datos respecto a su nombre y sexo en el Registro Demográfico y en su licencia de conducir, pierden valor si las oponemos al perjuicio resultante de esa decisión. Recordemos que, por definición, se trata de una persona que cambia totalmente su asignación sexual, como sucede con la peticionaria, quien aunque nació varón se identifica con el otro sexo hasta el punto de someterse a una compleja cirugía y a tratamiento

---

[55] Precisamente, en el caso de Figueroa Ferrer v. ELA, supra, este Tribunal se enfrentó a la interpretación de nuestra ley de divorcio, la que no incluía ni prohibía un divorcio bajo el fundamento jurídico de consentimiento mutuo. En esa ocasión nos basamos en ambos derechos, el de la dignidad y el de la intimidad, para realizar una interpretación jurídica, que, al igual que en el caso de autos, no pretendió usurpar las funciones delegadas a la Legislatura, sino interpretar las leyes promulgadas por esa Rama del Gobierno.

hormonal. **Podemos no comprender la angustia que lleva a un ser humano a una decisión tan drástica. Incluso, podemos estar, en nuestro fuero interno individual, en contra de tan drástica solución a esa situación de angustia existencial.** Pero lo cierto es que nuestro ordenamiento permite utilizar los medios que provee la ciencia para conformar la apariencia al sexo deseado, si la persona transexual, ejerciendo su libre albedrío, decide hacerlo. Ejercido así el derecho a cambiar de sexo, en la intimidad que protege nuestra Ley Fundamental, no debemos los tribunales, guardianes de la Constitución, condenarle a someterse diariamente a discrimen al presentar una licencia de conducir que no corresponde a su realidad o un certificado de nacimiento que no corresponde a su identidad.[56]

A los tribunales nos toca la delicada responsabilidad de armonizar nuestra interpretación del Derecho con los avances de la ciencia y la tecnología.[57] Situaciones que en un principio eran inconcebibles hoy día son posibles por los adelantos de la ciencia. Así lo hemos reconocido en asuntos relacionados con la filiación

---

[56] Tomamos conocimiento judicial del uso de la licencia de conducir para propósitos de identificación en actividades del diario vivir y del certificado de nacimiento para asuntos tan importantes como la búsqueda de empleo. En cuanto a esto, hemos resuelto que un trabajador en busca de empleo no debe tener que abdicar su derecho a la intimidad al permitir que el patrono invada su mente y ausculte sus pensamientos. **Ambos derechos, a la intimidad y al trabajo, son consustanciales con la dignidad humana.** Arroyo v. Rattan Specialties, Inc., 117 DPR 35 (1986).

[57] Según la Real Academia Española armonizar significa "[p]oner en armonía, o hacer que no discuerden o se rechacen dos o más partes de un todo, o dos o más cosas que deben concurrir al mismo fin." *Diccionario de la Lengua Española*, Vigésima Segunda Ed., pág. 207 (2001).

jurídica. Véanse: <u>Castro Torres v. Negrón Soto;</u> opinión de 23 de mayo de 2003, 159 DPR__, 2003 TSPR 90; <u>Ramos v. Marrero</u> 116 DPR 357, (1985); <u>Moreno Alvarado v. Moreno Jiménez</u>, 112 DPR 376(1982); <u>Ortiz v. Peña</u>, 108 DPR 458 (1979). Hace apenas dos meses este Tribunal decidió permitir una prueba de DNA para impugnar el reconocimiento voluntario. <u>Antonio Luis Mayol v. Ana Ixa Torres</u>, res. el 8 de abril de 2005, 163 DPR ____ (2005), 2005 TSPR 45. La solución que adopta la mayoría en el presente caso constituye una anomalía dentro de esta trayectoria y es contraria a los fundamentos de estas decisiones.

Las personas transexuales no encajan dentro de la categoría de "femenino" ni "masculino". Por eso, recurren a la ciencia, que les permite operarse y someterse a tratamiento hormonal para vivir su vida según uno de estos dos sexos: "Una persona que se somete a una operación *irreversible* para adecuar su sexo físico a su deseo psicológico no desea vivir como un transexual, como una clasificación extraña y discordante con la dualidad de sexos culturalmente reconocida." <u>Ex Parte Andino Torres,</u> supra, en la pág. 808. El Derecho nos concede la facultad de interpretar esta realidad y la Constitución nos impone la responsabilidad de hacerlo, ordenando una simple enmienda de su nombre y su sexo en el Registro Demográfico y en el Departamento de Obras Públicas.

**El dilema de la peticionaria no se resuelve ni aminora con el "remedio" a medias que dispone la Opinión Mayoritaria.** Concederle el permiso para cambiar su nombre en el certificado de nacimiento, de "Alexis" a

"Alexandra", a la vez que se mantiene la descripción de su sexo como "masculino", deja a la merced del escrutinio público el propio hecho que la parte peticionaria desea enmendar. No podemos olvidar que "[u]na cierta bondad es necesaria para la efectividad del Derecho, y la caridad quiere un Derecho que lo sea efectivamente." Legaz Lagambra, supra en la pág. 92. Por eso se ha dicho, que el Derecho es "el Arte de lo justo." Juan Vallet de Goytisolo, *Panorama del Derecho Civil*, Segunda Edición, pág. 38-39 (1973). En este sentido, nos sorprende que la Opinión Mayoritaria reconozca que quienes "han decidido someterse a una operación de reasignación de sexo, son personas que han tomado medidas extraordinarias en su ardiente deseo de vivir una vida ordinaria" y sin embargo, no les permita vivir esa vida ordinaria, que no es otra cosa que una vida donde le garanticemos su intimidad y dignidad como seres humanos.

Por los fundamentos que anteceden, disentimos. Revocaríamos en su totalidad la sentencia del foro apelativo y confirmaríamos la orden del Tribunal de Primera Instancia autorizando el cambio de nombre **y** sexo en el certificado de nacimiento de Alexandra, en los expedientes computadorizados de ese certificado, en su licencia de conducir y en los expedientes del Departamento de Transportación y Obras Públicas.

Liana Fiol Matta
Jueza Asociada